**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edwin Francis LINK, Robert Noble Casale, Louis John Ippolito, Barbara Jean Pace, Donald D'Amico, Defendants–Appellants.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Frank CARCAISE, Defendant–Appellant.**

Nos. 88–5761, 88–6099.

United States Court of Appeals, Eleventh Circuit.

Jan. 30, 1991.

---

Dexter W. Lehtinen, U.S. Atty., Joseph A. DeMaria, U.S. Dept. of Justice/Miami Strike Force, Joe H. Vaughn, U.S. Dept. of Justice, Miami, Fla., Frank J. Marine, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Arthur Joel Berger, Miami, Fla., for Pace & Casale.

John Weinberg, Miami, Fla., for Link.

Thomas M. Dawson, Leavenworth, Kan., for Ippolito.

Kent Wheeler, Miami, Fla., for D'Amico.

Thomas Almon, Almon & Brodsky, Miami, Fla., for Carcaise.

Before FAY and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

These consolidated appeals are taken from the conviction of the appellants in two separate trials resulting from the same indictment for violation of several of the United States narcotics laws.

## I. STATEMENT OF THE CASE

On December 18, 1986, an indictment was filed in the United States District Court for the Southern District of Florida that charged 49 defendants with a total of 105 counts arising from an extensive organization involved in the importation and distribution of large quantities of cocaine, marijuana and counterfeit quaalude pills

that contained the controlled substance diazepam. Appellants Link, Casale, D'Amico, Ippolito and Pace were tried together in March and April of 1988. Appellants Carcaise and Claiguri were tried together in May of 1988.

The Appellants were convicted and sentenced as follows:

Link: (1) conspiring to violate RICO; (2) two counts of possession of diazepam with intent to distribute; total sentence five years.

Casale: (1) conspiring to violate RICO; (2) importation of diazepam; (3) three counts of possession of diazepam with intent to distribute; (4) two counts of possession of cocaine with intent to distribute; (5) two counts of interstate travel to promote unlawful narcotics activity; total sentence: 13 years.

Ippolito: (1) conspiring to violate RICO; (2) three counts of possession of diazepam with intent to distribute; (3) two counts of possession of cocaine with intent to distribute; (4) three counts of interstate travel to promote unlawful narcotics activity; total sentence: 17 years imprisonment and three years special parole.

Pace: (1) conspiring to violate RICO; (2) three counts of possession of cocaine with intent to distribute; (3) possession of diazepam with intent to distribute; using a telephone to facilitate possession of cocaine with intent to distribute; total sentence: six years imprisonment and three years special parole.

D'Amico: (1) possession of diazepam with intent to distribute; (2) two counts of interstate travel to promote unlawful narcotics activity; total sentence: five years imprisonment and one year special parole.

Carcaise: (1) conspiring to violate RICO; (2) possession of diazepam with intent to distribute; total sentence 15 years imprisonment and 1 year special parole.

These appeals followed. This Court consolidated the two appeals.

## II. STATEMENT OF THE FACTS

In 1981 coconspirators Michael Thifault, Peter Berry, William Lynch and John Mantesta formed a partnership to import and distribute methaqualone, cocaine, diazepam and marijuana. This partnership was known as the "Berry organization."

In early 1982 Thifault transported 300,-000 counterfeit quaalude pills from Canada to Berry's house in Florida. Berry distributed 100,000 pills to appellant Casale for him to sell to others in two deliveries of 50,000 pills each. In turn, Berry had 50,-000 counterfeit quaaludes delivered to appellant Ippolito in California.

In late March of 1982 Berry delivered the remaining 200,000 counterfeit quaaludes to appellant Casale in Florida. Casale had these narcotics delivered to Ippolito in California.

In April of 1982, the Berry organization imported approximately 1,000,000 counterfeit quaaludes and delivered 280,000 to Casale in Florida for later delivery to Ippolito in California.

Shortly thereafter, appellant Ippolito met with Berry and appellant Casale in California to discuss a plan to import marijuana from Colombia. In May of 1982, Berry gave Ippolito $15,000 to pay the owner of the boat that was to transport the marijuana.

On or about June 2, 1982 coconspirator Edward Barns picked up 16,000 counterfeit quaaludes from Casale.

In late July or early August the Berry organization imported another one million counterfeit quaaludes from Canada for delivery in Florida.

Meanwhile, the Berry organization delivered quaaludes to appellant Pace, a major distributor, in Miami. Pace maintained a ledger recording her drug transactions.

The appellant Link, a/k/a "Ed Club" or "Club Ed", was a close friend of Casale and a distributor for the organization. In June of 1982, Berry had 50,000 counterfeit quaalude pills delivered to Link.

In August of 1982, appellant Ippolito traveled from California to Florida to discuss the marijuana importation scheme with the Berry organization, further pill deliveries and to pay for pills previously

delivered. Appellant D'Amico traveled with him. The two stayed at the Calder Holiday Inn in Miami.

On August 26, 1982, D'Amico called co-conspirator Lloyd Krusemark in Las Vegas and asked him to drive a load of counterfeit quaaludes from Florida back to California in exchange for $3,000. Krusemark agreed and flew to Florida.

On August 30, 1982, Ippolito, Krusemark and Frank Hanophy purchased a car from Ippolito's brother's car dealership for the trip back to California. As Krusemark and Hanophy loaded the boxes of pills into the car in the parking lot of the Holiday Inn, however, FBI agents detained them and seized the drugs.

The FBI agents questioned Ippolito in his room. He identified himself as "Lou Marino" and told them that "Frank" and "Lloyd" had access to his room. He later denied knowing Frank Hanophy and Lloyd Krusemark, however. Ippolito and Krusemark were not arrested.

The FBI did arrest Berry and Mantesta, however. They seized over 1,000,000 counterfeit quaaludes from Berry's warehouse in Florida.

With Berry in jail, appellant Casale assumed control of the Berry organization, and in September of 1982 Casale received a shipment of 750,000 to 1,000,000 counterfeit quaaludes which he distributed to various people.

In early 1983, Thifault delivered 25,000–50,000 counterfeit quaaludes to appellant Link pursuant to Casale's directions. Later, in March of that year, Thifault made one delivery of 250,000 quaaludes and another of 125,000 quaaludes to appellant Carcaise. In November of 1983, Thifault delivered another 100,000 counterfeit quaaludes to Carcaise. Carcaise, in turn delivered those pills to customers, one of whom was an undercover DEA agent.

Casale remained in control of the Berry organization until Berry resumed control in June of 1983. After Berry resumed control he continued to deal in narcotics. The authorities arrested him in March of 1984.

The FBI arrested Lynch and Thifault shortly thereafter.

In January of 1985, appellant Pace had several conversations with an undercover DEA agent named Mark Bumar. In the course of those conversations she admitted that she had an extensive drug distribution network. She was later arrested.

At trial, Carcaise was the only defendant to testify. He admitted that he was convicted in 1983 for dealing in quaaludes and in 1985 or 1986 for smuggling cocaine. He denied all of the charges against him in this case. On cross examination, he admitted that he had sold 250,000 counterfeit quaaludes to an undercover DEA agent.

Appellant Ippolito introduced testimony that he was in Florida in 1981 and 1982 in connection with a legitimate real estate transaction.

## III. ISSUES

1. Whether the Government presented sufficient evidence to identify the appellant, Edwin Link, as the "Club Ed" or "Ed Club" about whom witnesses testified.

2. Whether evidence that appellant Link possessed diazepam with intent to distribute on two separate occasions and obtained the drug from the same distributors each time was sufficient to establish a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1962(c).

3. Whether the district court erred in denying Link's motion for severance.

4. Whether evidence that appellant D'Amico transported "quaaludes" was sufficient to convict him of transporting the illegal substance diazepam.

5. Whether the district court erred in failing to permit appellant Ippolito to call Frank Hanophy as a witness.

6. Whether the district court erred in refusing to give a missing witness instruction regarding Frank Hanophy.

7. Whether the prosecutors and the court constructively amended count one of the indictment charging the Pace and Casale with conspiracy to violate RICO and

thus entitling them to a new trial on this count.

8. Whether the trial court erred in denying Casale's motion to exclude the testimony of government witness Thifault, resulting in a violation of appellant Casale's sixth amendment right to counsel.

9. Whether the district court abused its discretion in sentencing appellant Ippolito by relying on evidence that he was *associated* with organized crime.

10. Whether the convictions of appellants Casale and Carcaise for RICO conspiracy were in violation of the double jeopardy clause of the fifth amendment?

## IV. DISCUSSION

### Introduction

We consider that only four of the issues raised by the appellants warrant discussion. Issues 1, 3, 4, 7, 8 and 9 are clearly without merit. We, therefore, discuss only issues nos. 2, 5, 6 and 10.

(1) Was evidence that appellant Link possessed diazepam with intent to distribute on two separate occasions and obtained the drug from the same distributors each time sufficient to establish a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1962(c) (the RICO statute).

■ At trial, the Government presented evidence that on or about June 4, 1982 Berry had 50,000 counterfeit quaaludes delivered to appellants Casale and Link, who were good friends. It also presented evidence that Casale had 25,000–50,000 quaaludes delivered to Link early in 1983, during which time Casale was in charge of the Berry organization. This evidence served as the basis of Link's two possession with intent to distribute convictions.

Appellant Link contends that this evidence is insufficient as a matter of law to establish a "pattern of racketeering activity" as required for a conviction under 18 U.S.C. § 1962(c). He admits that two acts of racketeering are sufficient to create a pattern, but points out that two isolated acts, without more, are not sufficient.

There must be "continuity plus relationship" to establish a pattern.

According to Link, the government has established nothing more than Link's participation in two isolated crimes almost a year apart. The only relationship between the two events was the fact that the source of supply for both was the same organization.

In response, the Government points out that racketeering acts have the requisite relationship when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989) (quoting 18 U.S.C. § 3575(e)). It argues that Link's two acts of possession with intent to distribute had the same purpose, involved the same participants and method of commission, and were committed in furtherance of the affairs of the same enterprise.

Further, the Government argues that the requisite continuity may be established by the totality of the evidence and that proof of continuity is not restricted to the racketeering acts themselves. In *H.J. Inc.*, the Supreme Court stated: "[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* 109 S.Ct. at 2902. It is clear that Link's criminal acts were part of a long term relationship with an organization that existed for a criminal purpose. We conclude that there was sufficient evidence to support a finding of a "pattern of racketeering activity."

(2) Did the trial court err in failing to permit appellant to call Frank Hanophy as a witness?

■ The Sixth Amendment to the Constitution of the United States provides in pertinent part as follows: "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...."

As we stated in *United States v. Garmany*, 762 F.2d 929 (11th Cir.1985):

> Federal Rule of Criminal Procedure 17 governs the issuance of subpoenas in criminal cases.... For a defendant who is financially unable to pay these costs Rule 17(b) requires the court to subpoena witnesses on that defendant's behalf "upon a satisfactory showing ... that the presence of the witness is necessary to an adequate defense."

*Id.* at 933, 934.

"The grant or denial of a Rule 17(b) motion is committed to the discretion of the district court and is subject to reversal on appeal only upon a showing of abuse of that discretion." *U.S. v. Rinchack*, 820 F.2d 1557, 1566 (11th Cir.1987) (citing *United States v. Hegwood*, 562 F.2d 946 (5th Cir.1977)), and other cases.

Appellant relies upon the following language from *Hegwood:*

> *Welsh* [*v. United States*, 404 F.2d 414, 417 (5th Cir.1968)], further establishes that once the defendant asserts facts which, if true, would be relevant to any issue, the motion for a subpoena must be granted unless the assertions are facially incredible or unless the government can show that they are untrue or that the request is frivolous....

*United States v. Hegwood*, 562 F.2d 946, 953 (5th Cir.1977).

This Court has recently discussed the requirements for a defendant in making a Rule 17(b) request. We stated as follows:

> As a threshold matter, a defendant making a Rule 17(b) request bears the burden of articulating specific facts that show the relevancy and necessity of the requested witness's testimony. *Hegwood, supra*, 562 F.2d at 952; [*U.S. v.*] *LeAmous, supra*, 754 F.2d [795] at 798 [(8th Cir.1985)]. In exercising its discretion, the court may consider other factors pertaining to the prospective witnesses' testimony as well, including materiality, competency and the timeliness of the request. *Hegwood, supra*, 562 F.2d at 952; *United States v. Pitts*, 569 F.2d 343, 349 n. 10 (5th Cir.), *cert. denied*, 436 U.S. 959, 98 S.Ct. 3076, 57 L.Ed.2d 1125

(1978). The appellate courts have upheld the refusal of district courts to issue a Rule 17(b) subpoena where the request was untimely, the testimony sought was cumulative, or the defendant failed to make a satisfactory showing of indigency or *necessity.* [*U.S. v.*] *Sims, supra*, 637 F.2d [625] at 629 [(9th Cir.1980)], *see, e.g., Hegwood, supra*, 562 F.2d at 953 (timeliness and failure to show necessity); *United States v. Martin*, 567 F.2d 849, 852–53 (9th Cir.1977) (cumulative); *United States v. Stoker*, 522 F.2d 576, 579 (10th Cir.1975) (timeliness and failure to show indigency and necessity).

*U.S. v. Rinchack*, 820 F.2d 1557 (11th Cir. 1987) (emphasis added).

The Government contends that Ippolito made no showing that Frank Hanophy's testimony would support his contention that he was not present at the time the automobile was purchased. The Government's argument is supported by the fact that Ippolito stated to the FBI that Hanophy and Krusemark had access to his room in the motel where the crime was committed. Assuming that Hanophy would testify truthfully, his testimony would be harmful rather than helpful to Ippolito. In fact, it would destroy his defense because of the overwhelming showing of Ippolito's participation with Hanophy and Krusemark in the drug transactions.

We conclude, therefore, that the trial court did not err in refusing to require the testimony of Hanophy as a defense witness.

(3) The trial court's refusal to give the "missing witness" instruction relating to Frank Hanophy.

■ Appellant moved for the trial court to give the jury the following instruction: If it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion should be drawn by you with regard to a witness who is equally available to both parties, or

where the witness's testimony would be merely cumulative.

The jury will always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The trial court refused to do so and appellant claims this refusal was reversible error. Appellant concedes, by citing *United States v. Montoya,* 676 F.2d 428 (10th Cir.1982), that "The decision to refuse such an instruction falls necessarily within the trial judge's discretion." *Id.* at 431.

In considering whether the trial court abused its discretion refusing the requested charge, we consider the same elements relating to the appellant's contention that he should have had the benefit of the confidential informant's testimony in his favor, which subject we discussed above. As we pointed out there, appellant showed no necessity for the testimony of Hanophy, since Hanophy's testimony, if given, would not have benefitted Ippolito. To the contrary, it would have destroyed his defense. We are aware of no authority requiring the giving of a "missing witness" instruction to the jury if the so-called missing witness would testify against the interests of the defendant. The rule itself states: "If it is peculiarly within the power of either the prosecution or the defense to produce a witness *who could give material testimony on an issue in the case....*" (emphasis added).

In order to be material to the defense, the testimony would have to be favorable to Ippolito. Here, as we have already pointed out, his testimony would be highly unfavorable.

Therefore, we conclude that the trial court did not err in refusing to give the missing witness instruction.

(4) Were the convictions of Casale and Carcaise for RICO conspiracy in violation of the double jeopardy clause of the Fifth Amendment?

■ The December 1986 indictment in this case charged appellants Casale and Carcaise with conspiracy to violate RICO and listed numerous predicate racketeering acts. At trial, appellant Casale was convicted on a total of six racketeering acts, including racketeering acts 48 (possessing with intent to distribute ⅛ gram of cocaine on May 20, 1983) and 70 (possessing with intent to distribute diazepam on June 8, 1983). Appellant Carcaise was convicted on a total of four racketeering acts, including racketeering acts 66 (possessing diazepam with intent to distribute on March 22, 1983) and 67 (possessing diazepam with intent to distribute on May 25, 1983).

The constitutional issue raised here results from the fact that Casale had previously been indicted for the crimes listed in racketeering acts 48 and 70 in 1983 (they were dismissed pursuant to a plea agreement in which he pled guilty to another crime) and Carcaise had been convicted in 1983 of the crimes listed in racketeering acts 66 and 67. Evidence of both the plea agreement and the convictions were introduced at the subsequent trial to prove the predicate racketeering acts.

Casale and Carcaise contend that the double jeopardy clause was violated by the introduction of their prior convictions to prove essential elements of the RICO conspiracy charge at the later prosecution. They rely on the Supreme Court's recent decision in *Grady v. Corbin,* — U.S. —, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

This Court in a case just decided has rejected this contention. Consistent with two decisions by the Court of Appeals for the Third Circuit, *United States v. Pungitore,* 910 F.2d 1084 (3rd Cir.1990), and *United States v. Esposito,* 912 F.2d 60 (3d Cir.1990), we held that the Supreme Court in *Grady* did not reverse or overrule or in any way weaken the Court's previous decision in *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), which had held that a prior conviction on a predicate drug offense did not operate as a double jeopardy bar to a later prosecution under 18 U.S.C. § 848, for engaging in continuous criminal conduct (CCE). We held that the facts in *Garrett* were more analogous to the present case than *Grady.* We stated:

Grady's double jeopardy formulation barring successive prosecutions involving the same "conduct" is, by its facts and the facts of the cases it relies upon, limited to single act crimes. The Supreme Court's holding in *Garrett* clearly allows for subsequent prosecutions for complex crimes such as the RICO violation ... notwithstanding an earlier conviction on a predicate charge.

*U.S. v. Gonzalez,* 921 F.2d 1530 (11th Cir. 1990).

This, of course, is binding precedent for this Court.

## CONCLUSION

The judgments and sentences are AFFIRMED.