[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12854

_____

D. C. Docket No. 05-00041-CR-41-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONNIE LEE DOUGLAS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(June 19, 2007)**

Before PRYOR, KRAVITCH and ALARCÓN,* Circuit Judges.

PER CURIAM:

_____

*Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

Appellant, Ronnie Lee Douglas, Jr., appeals his convictions and sentences for kidnapping, in violation of 18 U.S.C. § 1201(a)(2), robbery, in violation of 18 U.S.C. § 2111, and carjacking, in violation of 18 U.S.C. § 2119.

## I. Background

The Evidence at trial was as follows:

On the evening of February 10, 2005, Tammy Young, who was six months pregnant at the time, and her two year-old son, L.Y., were shopping at a department store located on the Fort Gordon military base in Georgia. After leaving the store, Young walked to her car and placed L.Y. in his car seat. She then turned to retrieve her purse from the shopping cart when she saw a man standing very close to her. Young later described the man as a tall black male of slender build in his early twenties and wearing dark oversized clothing and a red baseball cap. Startled by the man, Young screamed, and the man, who was holding a gun down by his groin, told Young to be quiet. The assailant then instructed her to give him her money, but Young had spent her money in the store. Young offered to give the man her ATM card. In response, he told Young to leave her son and accompany him to a nearby ATM machine. Young refused to leave her son and offered the man her credit cards, ATM card and pin number, and car keys. Young then started to unbuckle L.Y. from his car seat, at which point the assailant

2

told Young that if she tried to run he would hurt her.

Young, who was frightened by the threat and feared that she and her son would be hurt if she did not comply with the man's demands, was forced to get into the car and was driven by the man to a Wachovia bank. At the bank, the man pulled the car up in front of the drive-through for the ATM. He instructed Young to get out of the car and get the money while he stayed behind with L.Y. Young refused to leave her son in the car and proceeded to take him out of his car seat. When Young exited the car, the assailant also got out of the car and they walked to the ATM machine. At this point, the man had his hand in his pocket and told Young that the gun was in the pocket. Young then made two $200 withdrawals, which was the maximum she could withdraw in one day, and handed the money to the man. The assailant told Young to get back in the car so they could go to another ATM machine. Young refused because she was afraid that he would kill them. She then offered the man her ATM card and pin and told him to take the car and leave them behind. The man agreed and told her to back up against the wall and not to leave until he gave her the "go ahead."

The man then walked back to Young's car and got inside. Young saw him turn on the interior light, take off his hat and place it on the dashboard, and count the money. The man then waved that Young and her son could leave and they ran

3

to a nearby restaurant as the man drove away in the direction of gate 5. Young estimated that the entire incident lasted approximately twenty minutes.

Inside the restaurant there were three military police officers. Young told them what happened, and they relayed the information to other officers and instructed that the base's gates be closed. Sergeant Tyrone Herring left the restaurant and proceeded towards gate 5. After searching for Young's vehicle at gate 5, Officer Herring went to the gate 5 shopette and found a vehicle matching the description. Officer Herring and others searched the car and located Young's purse and a red hat on the dashboard. The officers did not find a gun. A search of the area ensued, but the assailant was not found. A crime scene investigation unit dusted the vehicle for fingerprints and found several fingerprints on the driver's side door.

On February 11, 2005, FBI Agent Charles McKee showed Young four photographic arrays, each consisting of six pictures and told her to place her initials next to the individual in each that most resembled the perpetrator. Young identified two men. Douglas did not appear in any of the arrays. Young testified that she did not believe she was choosing the assailant, rather, she believed she was selecting the individual that most closely resembled the assailant so the police could use characteristics from that photograph to assist in their investigation.

4

Young also assisted the investigators with creating a sketch of the perpetrator. In late February, McKee learned that a fingerprint lifted from Young's vehicle was identified as belonging to Douglas. McKee then prepared another photographic array for Young, this one containing a photograph of Douglas. In this photographic array, McKee testified that Young immediately ruled out four of the six pictures. Young then spent approximately thirty-five minutes selecting from the remaining two pictures, one of which was of Douglas, though Young eventually selected the individual who was not Douglas. Finally, on March 11, 2005, Young was shown surveillance photographs of an individual believed to be Douglas exiting Augusta Technical College earlier in the day on February 10, 2005. Young told investigators that the person in the photographs looked very similar to the assailant, although she did not recall the red shirt pictured in the video.

Douglas was arrested on March 17, 2005. When authorities arrived at Douglas's residence to arrest him, they found him hiding in a closet.

At the time of Douglas's arrest, testing had not been completed on the red baseball cap found in Young's car. Subsequent testing on a hair found in the cap revealed that it was dissimilar to hair retrieved from Douglas. DNA testing on the cap revealed DNA belonging to "at least four or more individuals." In this regard,

5

one of Douglas's friends testified that he often allowed friends to borrow his hats, that before the incident he had loaned Douglas a red Braves cap identical to the one found in Young's car, and that the cap had never been returned.  Government DNA expert Jennifer Luttman stated that "[t]he probability of selecting an unrelated individual at random from the general population who could be a potential contributor to the mixture of DNA detected on the hat [was] approximately 1 in 19 from the African American population" and Douglas's DNA profile fell within the 6 percent of the African American population that could not be excluded as a potential contributor.

Shortly before trial, the government disclosed two supplemental opinions from its fingerprint expert, Investigator DeWayne Piper.  The opinions stated that the fingerprints found on Young's vehicle were made not more than a few hours before the lifts were taken and that the fingerprints were made in the process of closing the door.  Douglas requested a Daubert[1] hearing, after which the district court determined that the proffered testimony was admissible.

During the trial, Young identified Douglas as the assailant.  She also was shown the video from Augusta Technical College recorded the day of the attack. She stated that the individual in the video was the same height, wore a similar coat,

_____

[1] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

6

pants, and hat, and had the same facial features as her assailant.

Piper testified regarding his supplemental opinions, and stated that the pressure distortion of the fingerprint found on the door of Young's car, which was a match for Douglas, indicated that the print was made while the vehicle door was being closed. He also testified that, based on the environmental conditions, having been told by investigators that it had rained approximately eight hours the day before the incident, and his personal experience, the print matching Douglas did not appear to have been left on the door a couple of days before.

Also at trial, a friend of Douglas's, Jerry Freeman, testified that on the evening of February 10, 2005, Douglas called Freeman around 6:00 pm and asked to be picked up at Augusta Technical College, where the two took a class together, and dropped off in his neighborhood. Freeman obliged, and then returned to class. Later that evening, sometime after 11:00 pm, Freeman, who had gone to a pool hall with other friends after class, received a telephone call from Douglas. Douglas asked Freeman to pick him up at a gas station near Fort Gordon.

McKee testified that Douglas provided him with three different alibis. The first alibi was that he was in class at Augusta Technical College during the robbery. When McKee showed Douglas records indicating he was absent from class, Douglas stated that he must have left class early to go to a pool hall with

7

Freeman. Freeman testified at trial, however, that Douglas was not with him at the pool hall that evening. With regard to the third alibi, while in jail, Douglas wrote a letter to his girlfriend explaining what she should tell his attorney and testify to at trial regarding his whereabouts on February 10, 2005, including that he had been at her house that evening. This letter was read aloud to the jury.

The government also presented other evidence, including the testimony of two inmates with whom Douglas had been confined, each of whom testified that Douglas had confessed to the crimes.

During the trial, an issue arose regarding the government's fingerprint evidence. Of particular focus for Douglas was a fingerprint identified as "C. A latent impression" on the interior dash of Young's car next to the abandoned red cap. The fingerprint was noted on a crime scene sketch that appeared to have been created by CID Special Agent Eddie Harris and verified by CID Special Agent Brian Wilhelm. At trial, Harris testified that he had not prepared the sketch, but, rather, he believed the sketch was made by CID Special Agent Marcia Fox. Harris also stated that the sketch was wrong when it indicated that a fingerprint had been located on the dashboard of Young's car. This was supported by the testimony of Wilhelm, who had dusted the inside of the vehicle for fingerprints. Douglas requested that Fox be called to testify, but it was determined that she was in

8

Maryland. The district court then ruled that it would not require Fox to return from Maryland, but instructed counsel for Douglas that "if you chose to call her by telephone conference I will deal with that and I will swear her just as if she was in the courtroom and I will allow you to proceed in that fashion if it's agreeable to both sides and requested by the defense." Counsel for Douglas responded, "We will go with that, Your Honor." Fox then testified by telephone, confirming that she had created the sketch. She also confirmed that no latent fingerprint was discovered on the dashboard of the car and testified that the sketch was incorrect in listing such a print as having been found.

The jury convicted Douglas of kidnapping, robbery, and carjacking.[2] The Pre-Sentence Investigation Report ("PSI") calculated the total offense level for kidnapping Young as 38, which included an increase of 2 points pursuant to U.S.S.G. § 2A4.1(b)(3) because Douglas possessed or "otherwise used" a firearm during the kidnapping. As to the robbery and carjacking counts, the PSI calculated a total offense level of 36, which included a 6 point increase pursuant to U.S.S.G. § 2B3.1(b)(2)(B) for otherwise using a firearm. For kidnapping L.Y., the PSI calculated a total offense level of 38, which included a 2 point increase pursuant to U.S.S.G. § 2A4.1(b)(3) for otherwise using a firearm. The PSI then added a 2

[2] Douglas was acquitted of Count Five, knowingly using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).

point multiple count adjustment and concluded that the total offense level was 40 with a criminal history category of IV, thus resulting in a range of 360 months to life in prison.

On November 23, 2004, Douglas moved for a 30-day extension to submit objections and responses to the PSI. The motion indicated that Douglas's attorney recently had learned that Douglas received counseling while in high school for behavioral and psychological issues, and he intended to seek an independent evaluation of Douglas. The district court granted the motion. On December 27, 2005, the court granted an additional 60-day extension. There is some dispute about the events that followed, but it appears that Douglas's counsel requested permission for Douglas to meet with Dr. Valerie Ross. During an in camera conference, the district court ruled that Douglas could meet with Dr. Ross, but she would not be permitted to testify unless the district court first determined that her testimony was admissible. On March 9, 2006, Douglas's counsel filed a Motion for Reconsideration under the mistaken belief that the district court had not allowed Douglas to meet with Dr. Ross. On April 13, 2006, the district court denied the motion and made clear that it had not prevented defense counsel from consulting with Dr. Ross. The district court clarified its position and stated, "defense counsel may consult with Defendant's psychologist at any time." On

10

April 17, 2006, Douglas's counsel filed another motion to continue the sentencing hearing, stating that a date and time for Dr. Ross's examination of Douglas had not been confirmed with the U.S. Marshals and Dr. Ross was not available. The district court denied the motion on April 25, 2006. In denying the motion for continuance, the district court noted that Douglas's counsel should have immediately notified the court about any issues with the Marshals.

At the sentencing hearing the next day, the district court overruled Douglas's objections to the PSI, noting that although the gun was never pointed directly at Young, it was used in connection with a verbal threat to hurt Young if she did not comply with Douglas's wishes. The district court then sentenced Douglas to 408 months' imprisonment for the kidnappings and 180 months' imprisonment for the robbery and carjacking, to be served concurrently.

Douglas now appeals, raising the following issues. First, Douglas argues that the district court improperly admitted the supplemental opinions of Piper. Second, he contends that the district court improperly denied him the right to call Fox to testify in person. Third, Douglas challenges Young's in-court identification. Fourth, he argues that there was insufficient evidence to convict him of carjacking. Fifth, Douglas challenges the court's denial of his final motion for a continuance. Finally, he challenges his sentencing enhancements for

11

otherwise using a firearm, for conduct not alleged or proven, and for conduct for which he was acquitted.

## II. Discussion

A.    Investigator Piper's Supplemental Opinions

Douglas first argues that the district court's admission of Piper's supplemental opinions regarding the age of the fingerprint on the vehicle door and the manner in which it was deposited violated Federal Rule of Evidence ("Rule") 702.[3] Douglas contends that (1) Piper was not qualified to render an opinion as to the age of the fingerprint, (2) he used a flawed methodology in making the age determination, (3) Piper never visited the crime scene, and (4) Piper improperly relied only on photographic evidence.

A district court's decision regarding the admissibility of expert testimony is reviewed for an abuse of discretion, and we defer to the district court's ruling unless it is "manifestly erroneous." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1339-40 (11th Cir. 2003). In determining the admissibility of

---

[3] Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

12

expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

Here, following a Daubert hearing, the district court concluded that Piper's opinions were grounded in sufficient "experience, education, training, background and more importantly in logic and practical application to meet the threshold requirements of admissibility as expert opinion." As to the supplemental opinions being delivered close to trial, the district court determined that there was sufficient time for the defense to challenge the findings.

Upon review, we conclude that the district court did not abuse its discretion in admitting Piper's supplemental opinions. Piper testified to his extensive experience and training in fingerprint analysis, including experience regarding the durability of fingerprints on different surfaces and in different environmental conditions and analysis of fingerprint smudging pressure. With regard to Piper's opinions, he presented sufficient information for the district court to conclude that

the methodology by which he reached these opinions was reliable and reasoned. The testimony assisted the jury in weighing the arguments of both the government and defense counsel regarding the significance of the fingerprint evidence. Accordingly, it was properly admitted.

B.    Testimony of Special Agent Marcia Fox

Douglas next argues that the district court improperly denied him the right to call Fox to testify in person about the sketch of Young's vehicle that showed a latent fingerprint on the dashboard. Douglas argues that this violated his constitutional right to present a complete defense and his right to hold the government to its burden of proof.

As an initial matter, we note that Douglas failed to object to the district court's denial of his request to subpoena Fox to appear in person. Where the defendant failed to raise a constitutional claim in the district court, we review for plain error. United States v. Camacho-Ibarquen, 410 F.3d 1307, 1315 (11th Cir.), cert. denied, 546 U.S. 951 (2005). We will correct plain error only where (1) there is an error; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding. United States v. Chisholm, 73 F.3d 304, 307 (11th Cir. 1996).

14

A defendant's right to present relevant evidence is not absolute, but rather is subject to reasonable restrictions. See Taylor v. Illinois, 484 U.S. 400, 410-11, 108 S. Ct. 646, 654, 98 L. Ed. 2d 798 (1988) ("The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right . . . . The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony."). A defendant's interest in presenting such evidence may "'bow to accommodate other legitimate interests in the criminal trial process.'" Rock v. Arkansas, 483 U.S. 44, 55, 107 S. Ct. 2704, 2711, 97 L. Ed. 2d 37 (1987) (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 93 S. Ct. 1038, 1046, 35 L. Ed. 2d 297 (1973)).

Here, the questionable value of Fox's testimony, her location in Maryland, the delay that would have resulted, and the fact that her telephone testimony merely reiterated what had previously been stated by two government witnesses at trial, support a conclusion that the district court properly denied Douglas's request. In this case, however, it is not necessary that we decide whether the trial court acted appropriately in denying Douglas's request because, under the third prong of the plain error test, Douglas cannot show that the district court's decision affected his substantial rights because, after a thorough review of the record as a whole, we conclude that there is other overwhelming evidence of guilt. Furthermore, Douglas

15

has not demonstrated that had Fox testified face-to-face, the result in this case would have been altered.

C.     In-Court Identification by Young

Douglas next argues that Young's in-court identification was unduly suggestive and lacking in reliability as he was the only African-American seated at the defense table, and, therefore, the identification violated his right to due process. In making this argument, Douglas refers back to the photographic arrays shown to Douglas during the investigation, where Young identified several individuals other than Douglas as the perpetrator.  Douglas also notes that Young helped investigators create a computer sketch of the suspect, which he argues does not resemble him.

Constitutional questions are reviewed de novo.  United States v. Brown, 364 F.3d 1266, 1268 (11th Cir. 2004).  Under Simmons v. United States, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247, 1253 (1968); see also United States v. Smith, 459 F.3d 1276, 1293-94 (11th Cir. 2006).  Douglas, however, does not argue that the prior

16

photographic line-ups were impermissibly suggestive, but, rather, he argues that Young's identification of others in these line-ups indicates that her in-court identification was unreliable and tainted by the fact that he was the only African-American at the defense table. For Douglas to prevail, he must demonstrate that the identification process was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." Code v. Montgomery, 725 F.2d 1316, 1319 (11th Cir. 1984); see also Simmons, 390 U.S. at 384. In making this determination, we consider the totality of the circumstances, including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Code, 725 F.2d at 1320; see also Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972).

Examining the factors above, we conclude that Young's in-court identification of Douglas was properly admitted. First, Young spent a considerable amount of time, approximately twenty minutes, with the perpetrator during the crime. Second, Young's attention was certainly focused on the perpetrator during the incident as she was attempting to ensure not only her own safety, but the safety

17

of her child.  Third, that Young identified another individual in the March 1, 2005, photographic arrays does not preclude her from making an in-court identification of Douglas.  See United States v. Johnson, 741 F.2d 1338, 1340 n.2 (11th Cir. 1984) ("The in-court identification was admissible; it was based on the teller's opportunity to observe Johnson at the time of the crime, which was substantially independent of the show-up.  Defense counsel could, and did, attack the weight of the identification by pointing out the teller's prior failure to identify Johnson."); United States v. Pollack, 427 F.2d 1168, 1169-70 (5th Cir. 1970) (rejecting an argument that a witness, who had been unable to identify the defendant from pictures, should not have been permitted to make an in-court identification).[4] McKee testified that Young focused almost immediately on Douglas and another individual, and then spent thirty-five minutes making a selection.  Furthermore, with regard to the earlier photographic arrays, Young testified that she believed she was merely identifying the individual who looked most like the perpetrator.  Also, whether the computer sketch created by investigators with the help of Young resembled Douglas was an issue for the jury to consider in weighing the strength of her in-court identification.  Fourth, Young made a clear and unambiguous

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions that the former Fifth Circuit issued prior to October 1, 1981.

18

identification of Douglas at trial, and, when subjected to cross examination, explained her decisions during the photographic arrays in a reasonable manner. Fifth, the length of time between the crime, February 10, 2005, and the in-court identification, October 17, 2005, was not so long as to lead to the conclusion that the identification was unreliable.

D.    Sufficiency of the Evidence

Next, Douglas argues that there was insufficient evidence to convict him of carjacking under 18 U.S.C. § 2119, because the government failed to present evidence that he acted with the "intent to cause death or serious bodily harm." Under § 2119, "[w]hoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall . . . be fined under this title and imprisoned not more than 15 years, or both . . . ."

We review de novo whether there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Douglas possessed the necessary intent under the carjacking statute. United States v. Diaz, 248 F.3d 1065, 1096 (11th Cir. 2001). In Holloway v. United States, 526 U.S. 1, 119 S. Ct. 966, 143 L. Ed. 2d 1 (1999), the Supreme Court addressed the mens rea element of 18 U.S.C. § 2119

19

and stated that in a "carjacking case in which the driver surrendered or otherwise lost control over his car without the defendant attempting to inflict, or actually inflicting, serious bodily harm, Congress' inclusion of the intent element requires the Government to prove beyond a reasonable doubt that *the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car*." Id. at 11-12 (emphasis added). Furthermore, the intent requirement "directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car." Id. at 8. This is not to say, however, that the taking of the car need be the only objective. Rather, a defendant demonstrates the necessary intent when he displays the intent to take command or gain control of a driver's car as an important step in the commission of some other crime, such as robbery or kidnapping. Diaz, 248 F.3d at 1096.

Here, we conclude that there was sufficient evidence that Douglas possessed the necessary intent for conviction under § 2119. Douglas took the car as an important step in the commission of his robbery. Furthermore, Douglas, after having shown Young that he had a gun, threatened her and stated that he would hurt her if she did not obey his commands. We believe this clearly establishes that Douglas had the intent to seriously harm Young if it had been necessary to

20

complete the taking of the vehicle.

E.    Douglas's Motion for Continuance

Douglas argues that the denial of his motion for a continuance to meet with a psychologist was a violation of his Fifth and Sixth Amendment rights because he was unable to secure the assistance of an expert at sentencing.

We review a district court's denial of a motion to continue sentencing for abuse of discretion. United States v. Lee, 427 F.3d 881, 896 (11th Cir. 2005). The defendant has the burden to demonstrate that "the denial was an abuse of discretion and that it produced specific substantial prejudice." United States v. Smith, 757 F.2d 1161, 1166 (11th Cir. 1985). In determining whether the denial of a motion for continuance was proper, we must decide "in light of the circumstances presented, focusing upon the reasons for the continuance offered to the trial court when the request was denied." United States v. Knowles, 66 F.3d 1146, 1160-61 (11th Cir. 1995). In so doing, we consider four factors: (1) the diligence of the defense in interviewing the witness and procuring his testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the specificity with which the defense was able to describe the witness's expected knowledge or testimony; and (4) the degree to which such testimony was expected to be favorable to the accused, and the unique or cumulative nature of the testimony. United States v.

21

Wright, 63 F.3d 1067, 1071 (11th Cir. 1995).

Here, the district court granted Douglas two continuances with regard to sentencing to enable him to meet with a psychologist. Yet, at the time the district court denied the final motion for continuance, the psychologist still had not met with Douglas and no definite appointment had been scheduled. Furthermore, as Douglas had not met with the psychologist, there was no way for Douglas to demonstrate what testimony might be offered or whether the testimony would be at all helpful to the defense. As such, we conclude that the district court did not abuse its discretion in denying Douglas's final motion for a continuance.

F.     Sentencing Enhancement

Douglas challenges the sentence enhancement for "otherwise using" a firearm. Douglas argues that the conduct here was mere brandishing. Furthermore, he argues that with regard to L.Y.'s kidnapping, there was no evidence of any direct threat against the child.

Young testified at trial that the perpetrator kept the gun pointed down towards his groin, and, on this basis, the district court concluded that Douglas "kept [the] gun down in as secretive location as he possibly could" with "the specific purpose of intimidating her and letting her know that this defendant could, through, various means, including the use of the firearm, do exactly what he

22

threatened to do . . . ." As such, the district court found that while the gun was not pointed at Young, it was used in connection with a verbal threat to intimidate her, which led to an increase in Douglas's offense level under U.S.S.G. §§ 2A4.1(b)(3) and 2B3.1(b)(2). Under these sentencing guidelines, Douglas had to have "otherwise used" a firearm, which is defined to mean "that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1, App. Note 1(I).

A district court's interpretation of the sentencing guidelines is subject to de novo review, while its factual findings are reviewed for clear error. United States v. Ellis, 419 F.3d 1189, 1192 (11th Cir. 2005).

As our case law has made clear, the "use of a firearm to make an explicit or implicit threat against a specific person constitutes 'otherwise use' of the firearm." United States v. Verbitskaya, 406 F.3d 1324, 1339 (11th Cir. 2005) (quoting United States v. Cover, 199 F.3d 1270, 1278 (11th Cir. 2000)). Here, Douglas showed Young the gun and told her that he would hurt her if she did not comply. Furthermore, we believe this explicit threat against Young was sufficient to find an implicit threat against L.Y., as he was unable to act independently of Young, and Young believed that they were both in danger of physical harm from Douglas. As

23

such, we conclude that the district court properly applied the increase in offense level for Douglas's having "otherwise used" a firearm.

G.     Constitutionality of Douglas's Sentence

Finally, Douglas argues that the district court improperly enhanced his sentence based on facts not alleged or proven and conduct for which he was acquitted. As Douglas concedes, however, the Eleventh Circuit has made clear that when a district court applies the guidelines in an advisory manner, nothing in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), prohibits the district court from imposing guidelines enhancements based on facts found by the judge by a preponderance of the evidence. United States v. Faust, 456 F.3d 1342, 1347-48 (11th Cir. 2006); United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005); United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, 545 U.S. 1127 (2005). As such, we affirm the sentence imposed by the district court.

## III. Conclusion

For the foregoing reasons, we **affirm** the convictions and sentences.