[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 21, 2011
JOHN LEY
CLERK

No. 10-13578
Non-Argument Calendar
_____

D. C. Docket No. 4:09-CR-00142-WTM-CRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HANNES ROBINSON,
a.k.a. John Robinson,
a.k.a. John Marsden,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(October 21, 2011)

Before BARKETT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

After pleading guilty, Defendant Hannes Robinson ("Robinson") appeals his sentence of 24 months' imprisonment for conspiring to defraud Bayer Healthcare ("Bayer") of money and property, in violation of 18 U.S.C. § 371. After review of the briefs and record, we affirm.

## I.  BACKGROUND

### A.    "Blood Derivatives" for Developing Countries

Bayer manufactured and sold "blood derivatives," which are prescription drugs used to treat illnesses such as cancer, hemophilia, hepatitis, and AIDS. Bayer utilized domestic exporters to sell blood derivatives to developing countries at substantially lower prices than Bayer offered to domestic customers.

In the 1990s, a domestic exporter, American Medical Link, Inc. ("AML"), purchased blood derivatives from Bayer.  AML received steep discounts because AML's owner, Nisar Khokhar, represented that the derivatives would be exported to developing countries.  AML, however, sold the pharmaceuticals within the United States at a profit.  Bayer discovered this fraudulent scheme and severed its relationship with AML and Khokhar.

### B.    Defendant Robinson's Offense Conduct

Subsequently, Khokhar contacted Defendant Robinson, who agreed to continue the scheme.  Defendant Robinson (a lawyer) contacted John Perez, the

2

owner and operator of Excim Trading Corporation ("Excim"), a domestic exporter of pharmaceuticals. Perez allowed Robinson to use Excim to purchase blood derivatives from Bayer.

Defendant Robinson, acting as an Excim representative, contacted John Cutter, Bayer's Director of International Business Management. Robinson told Cutter that Excim wanted to sell Bayer's blood derivatives to Africa and the Middle East. Robinson signed a written certification stating that "Excim . . . declares that all product[s] purchased from Bayer . . . are intended for export from the United States." From 2000 to 2005, Excim purchased $27,252,930.75 in blood derivatives from Bayer. Excim, despite the promise to export, sold Bayer's products in the United States at a substantial profit.

Bayer's Cutter learned of Excim's scheme during this period, but instead of terminating sales to Excim, Cutter joined the conspiracy. Cutter received kickbacks in exchange for concealing his knowledge of Excim's domestic sales of export-only pharmaceuticals and for allowing Excim's sales of Bayer products to continue.

In 2002, the Florida Department of Health ("DOH") inspected Excim's business records, which indicated Excim was selling pharmaceuticals intended for

3

export on the domestic market. The DOH sent a letter to Bayer asking whether Bayer was aware of Excim's practices.

Without advising any of his supervisors, Cutter responded in a letter stating that Bayer was aware of the domestic sales and that there were no restrictions on domestic wholesale distribution of products intended for export. Subsequently, before the grand jury, Cutter's then-supervisor, Chris Smith, testified that (1) Cutter did not inform him of the DOH letter or the Bayer response and (2) had Smith known of the allegations, sales to Excim would have been terminated.

## C.    The Indictment and Plea Agreement

In June 2009, a thirteen-count indictment charged Defendant Robinson with multiple charges, including conspiracy to commit wire fraud, mail fraud, and transportation of goods obtained by fraud, in violation of 18 U.S.C. § 371. In a written plea agreement, Robinson pled guilty to the § 371 conspiracy offense (Count 1). His co-conspirator Cutter also pled guilty to the § 371 conspiracy in a separate proceeding. Robinson's plea agreement provided for forfeiture of $400,000, which represented the proceeds obtained directly or indirectly from Robinson's conspiracy offense.

**D.      The Initial Presentence Investigation Report**

On January 11, 2010, the probation officer issued the initial presentence investigation report ("initial PSI").  On February 16, 2010, Defendant Robinson objected to three paragraphs in the initial PSI's loss calculation: (1) the assumption that Bayer suffered a loss; (2) the statement that intangible harms were relevant to the loss calculation; and (3) the calculation of Robinson's personal gain.

**E.      Robinson's Motion for a Rule 17(c) Subpoena**

Shortly after objecting to the initial PSI, Robinson moved for a Rule 17(c) subpoena to issue to Bayer, requesting disclosure of redacted material concerning Bayer's alleged knowledge of Excim's domestic sales.  Specifically, Robinson requested unredacted communications concerning: (1) the 1998 revelation of domestic sales by AML and Bayer's decision to terminate that sales relationship; (2) the 2003 revelation of domestic sales by Excim, and Bayer's decision to permit that sales relationship to continue; and (3) whether Bayer sustained any profit or loss from Excim's domestic sales.

The government responded that Robinson's motion was a "fishing expedition" and "misleading, at best."  The government contended that whether Bayer was defrauded or not was irrelevant because Robinson pled guilty to the

5

conspiracy offense. In a supplemental response, the government alleged that Robinson's motion was moot because Robinson had subsequently "withdrawn his objection to [the PSI's] loss calculation."

On April 2, 2010, the district court denied Robinson's motion, deeming it a "fishing expedition." The court stated that Robinson had no evidence of Bayer's complicity with Excim's scheme, but "simply hope[d] that his preferred explanation [was] true." Robinson's explanation was "nonsensical" because "profit motive makes little sense as the reason why Bayer would follow the law in 1998 . . . but ignore it in 2003 because in both cases the profit motive would have been roughly the same." Further, the court noted that Robinson ignored evidence, including an internal e-mail from Cutter and grand jury testimony from Lamb, which plausibly showed that the Bayer-Excim relationship continued because Cutter, a co-conspirator, convinced his supervisors at Bayer that the fraud allegations about Excim were unsubstantiated.

## F.   The Revised PSI and Addendum

Robinson's revised PSI, dated April 12, 2010, assigned a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2). The revised PSI applied (1) a two-level enhancement, pursuant to § 2B1.1(b)(9)(A) and (C), because Robinson participated in relocating the fraudulent scheme to evade law enforcement, and the

offense involved sophisticated means, and (2) a three-level reduction, under §

3E1.1(a) and (b), for acceptance of responsibility. The revised PSI also added

sixteen levels under § 2B1.1(b)(1)(I), based on a loss amount of $1,747,038.50,

representing Robinson's personal gain.

As to the loss amount calculation, the revised PSI noted that "Bayer suffered

an actual loss," because the co-conspirators purchased export-only blood

derivatives at a significantly reduced cost of $40,000,000, when Bayer could have

sold the pharmaceuticals domestically at a higher price. Nonetheless, the revised

PSI determined "the loss to Bayer . . . cannot reasonably be determined" because

Bayer could not calculate the domestic sale prices for each individual blood

product diverted over an extended period. "Such prices could vary widely"

depending on a variety of factors. Additionally, the revised PSI found that any

such loss calculation failed to account for non-economic harms caused by the

domestic diversion of export-only pharmaceuticals, such as not helping patients in

developing markets. Because Bayer's actual loss could not be reasonably

determined, the revised PSI determined that "gain should be used as an alternative

measure of loss," pursuant to U.S.S.G. § 2B1.1 cmt. n.3(B).

The revised PSI stated that "gain" could be calculated in three ways: (1) by

subtracting Bayer's sales price from another involved company's sales price to the

end user, which yielded $31,218,000 in gain; (2) by subtracting Bayer's sales price from all the involved companies' sales prices to wholesalers, which yielded $9,460,000 gain; or (3) by calculating on an individual basis how much each conspirator personally gained, which yielded $1,747,038.50 for Robinson. The revised PSI used the latter gain method.

Robinson's total adjusted offense level was 21. Based on Robinson's criminal history category of I, the PSI calculated Robinson's advisory guidelines range as 37 to 46 months.

This time, Robinson did not object to any aspect of the revised PSI's loss calculations, including the computation of his gain amount of $1,747,038.50. The Addendum to the revised PSI, also dated April 12, 2010, stated that Robinson submitted several objections to the revised PSI which were now resolved. Robinson's only objection pertaining to the loss calculation argued that the revised PSI improperly found that certain non-economic harms bolstered its conclusion that Bayer's actual loss was not reasonably determinable.

Aside from that objection, Robinson objected to the revised PSI's statements in paragraph 37 that no one at Bayer except for Cutter was aware of the Florida DOH inquiry. Robinson asserted that Bayer's upper management, namely Mary Ann Lamb, received the DOH letter stating they had discovered Bayer's

8

invoices for Excim's domestic sales of Bayer's export-only products. According to Robinson, Bayer's Lamb and Cutter drafted together the response letter stating there were no restrictions for the wholesale domestic distribution of export-only blood derivatives in the United States.

Although the DOH inquiry letter was addressed to and received by Lamb, the revised PSI noted that Lamb testified before the grand jury that (1) she had no responsibilities in the area of sales or distribution of Bayer products, and (2) because the DOH inquiry pertained to product distribution and pricing, Lamb had relied upon Cutter to provide the information. The PSI further noted that Defendant Robinson had conceded that Cutter, in consultation with Robinson, actually drafted the response to the DOH inquiry. Accordingly, the response letter was not "any sort of 'certification' from Bayer that export-only products could be sold domestically."

The April 12, 2010 Addendum to the revised PSI contained numerous attachments, including a summary of Cutter's May 2009 proffer interview with the government.

## G. The Sentencing

On July 14, 2010, the day of Robinson's scheduled sentencing, Robinson moved to continue his sentencing hearing. To his motion, Robinson attached a

9

copy of Cutter's sentencing memorandum (the "Cutter memo"), dated July 9, 2010, and written by Cutter's counsel. Robinson asserted he did not learn about the Cutter memo until two days before the hearing. According to Robinson, it was the first time any Bayer employee had disclosed that Bayer's actual loss could be much less than the government represented, contradicting the PSI's conclusion that Bayer's loss was not reasonably determinable. The Cutter memo stated, among other things, "[Cutter] genuinely believed [Bayer] . . . financially benefit[ted] from being able to sell at least some [p]roduct which it otherwise would have been forced to write off at a loss." Robinson requested a continuance in order to have time to investigate Bayer's potential loss amount based on the information in the Cutter memo.

At the beginning of the sentencing hearing, the district court denied Robinson's motion for a continuance. Robinson objected to the denial in light of what he argued was "new evidence" contained in the Cutter memo. The court found that the Cutter memo was not "new evidence," because Cutter had not verified it and the memo contained only his counsel's arguments. The court stated Robinson had "plenty of time to file any objections" to the PSI since the final, revised PSI was issued on April 12, 2010, several months before his July 14 sentencing.

10

Robinson's counsel then argued:

> I understand the Court's ruling, and I respect the ruling on the continuance. We would've liked more time to explore that. So, having said that, and having not had the—being denied the opportunity to further explore some of these new statements in the sentencing memorandum and whether there is a basis of fact in those, we do not object to the compromise the government has—that we've reached with the government regarding loss amount. There may be evidence out there that shows that in fact, as Mr. Cutter contends, this was financially beneficial to Bayer. We don't have that. We think it may exist based on Cutter's sentencing—Mr. Cutter's sentencing memorandum. But we're not in a position right now to put forward that position without further evidence based on the statements that Mr. Cutter said.
>
> So, with that, I guess a "qualified," we don't object to the compromise we've reached with the government.

The court adopted in full the factual statements and guideline calculations contained in the revised PSI. Thus, Robinson's advisory guidelines range was 37 to 46 months. After listening to the parties' arguments and testimony on the 18 U.S.C. § 3553(a) factors, the court sentenced Robinson to 24 months' imprisonment. The court varied downward from the guidelines range due to Robinson's serious medical condition as reported by his physician. Pursuant to the plea agreement, the court ordered Robinson to forfeit his interest in $400,000 to the United States. Neither party objected to the 24-month sentence as pronounced.

11

## III. DISCUSSION

**A.      Motion for a Rule 17(c) Subpoena**

Robinson argues that the district court erred by denying his Federal Rule of Criminal Procedure 17(c) motion for a subpoena.  We review for abuse of discretion the denial of a Rule 17(c) motion.  United States v. Perez-Tosta, 36 F.3d 1552, 1556 n.2 (11th Cir. 1994); see also United States v. Link, 921 F.2d 1523, 1528 (11th Cir. 1991) (Rule 17(b) motion).  Rule 17(c) authorizes the issuance of a subpoena duces tecum for the production of documentary evidence at trial.  Fed. R. Crim. P. 17(c).

Rule 17 "leaves broad discretion in the district court by allowing the trial judge to weigh numerous factors, including materiality, relevancy, and competency, in deciding whether to grant the request for a subpoena."  United States v. Johnson, 495 F.2d 1097, 1102 (5th Cir. 1974) (quotation marks omitted).[1]

Here, we cannot say the district court abused its discretion in finding that Robinson's request was a "fishing expedition" to see if the redacted information supported Robinson's mere allegations about why Bayer treated AML and Excim differently, and about Bayer's awareness of Excim's fraudulent domestic sales.  As

---

[1]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

the district court noted, Robinson ignored inconvenient evidence, such as Cutter's admitted role in convincing Bayer that the fraud allegations were unsubstantiated. More importantly, Robinson had already pled guilty to the fraud. The loss amount ultimately was based on Robinson's personal gain, which was substantially lower than any of the PSI's other calculations as to gain. In this sentencing context, Robinson has failed to show the district court abused its discretion in denying Robinson's Rule 17(c) motion.

## B. Motion for a Continuance

Robinson next argues that the district court erred in denying his motion to continue the sentencing hearing. We review for abuse of discretion a district court's denial of a motion to continue sentencing. United States v. Douglas, 489 F.3d 1117, 1128 (11th Cir. 2007). We focus upon the reasons for the continuance offered to the district court when the request was denied to determine whether the denial was proper. United States v. Edouard, 485 F.3d 1324, 1350 (11th Cir. 2007). The defendant has the burden to demonstrate that "the denial was an abuse of discretion and that it produced specific substantial prejudice." Douglas, 489 F.3d at 1128 (internal quotation marks omitted).

Robinson argues that the Cutter memo provided "new evidence" previously unavailable on the issue of Bayer's loss. Robinson asserts he should have been

given a continuance to investigate further whether Bayer suffered any loss and then to effectively change his prior argument that Bayer's loss could not be reasonably determined. However, the Cutter memo was not evidence, much less "new" evidence, because it was not verified and merely contained sentencing arguments by Cutter, who had a vested interest in minimizing Bayer's loss in the hope of obtaining a shorter sentence.

In any event, Robinson wholly fails to show how the contentions in the Cutter memo materially differ from information already in the record at the time of Robinson's sentencing hearing. More particularly, the Addendum in Robinson's revised PSI contained Cutter's proffer interview, which provided essentially the same information on Bayer's loss. In his proffer, Cutter stated that Bayer sold "short-dated" pharmaceuticals to domestic exporters, as opposed to writing them off, which helped boost its overall sales. In comparison, the Cutter memo stated that Cutter believed Bayer "financially benefit[ted] from being able to sell at least some [p]roduct which it otherwise would have been forced to write off at a loss." As the district court explained, Robinson knew of the same basic information as was contained in his co-conspirator's sentencing memo through the course of discovery.

14

Alternatively, the Cutter memo was not relevant given the uncontested loss amount based on Robinson's personal gain in the revised PSI and Addendum thereto. By failing to object to the revised PSI's loss calculation, Robinson admitted to the accuracy of the loss calculation for sentencing purposes. See United States v. Beckles, 565 F.3d 832, 844 (11th Cir. 2009) ("[A] failure to object to allegations of fact in a PSI admits those facts for sentencing purposes and precludes the argument that there was error in them." (quotation marks omitted)). For each of these reasons, the district court did not abuse its discretion in denying Robinson's motion for a continuance.

## C.    The Revised PSI's Loss Calculation

Robinson argues the district court erred in relying on Robinson's gain as the measure of loss because the government "failed to carry its burden" of establishing Bayer's actual loss. We ordinarily review for clear error the district court's loss determination. United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999). However, where, as here, the defendant raises an objection for the first time on appeal, we review for plain error. United States v. Bradley, 644 F.3d 1213, 1293 (11th Cir. 2011). "To establish plain error, a defendant must show that there is (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005). If that showing is met, we must

15

then determine whether the error seriously affected the fairness, integrity, or public reputation of the district court proceedings. Bradley, 644 F.3d at 1293. If so, only then will we consider whether the defendant entitled to relief. Id.

There was no error, much less plain error, here. "It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes." United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006). Only if the defendant challenges the PSI's factual statements must the government establish the disputed fact by a preponderance of the evidence. United States v. Martinez, 584 F.3d 1022, 1027 (11th Cir. 2009). As Robinson raised no objection to the revised PSI's statements, the district court was entitled to rely on the PSI's undisputed statements. See United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir. 1999).

In the revised PSI's loss calculation, paragraph 52 stated that "Bayer suffered an actual loss"; paragraph 53 stated that "the loss to Bayer . . . cannot reasonably be determined"; paragraph 54 noted that actual loss could not account for non-economic harm; paragraph 55 stated that "gain should be used as an alternative measure of the loss"; paragraphs 56 through 59 laid out three possible methods for determining gain, including Robinson's individual gain of $1,747,038.50; and paragraph 60 recommended that the loss amount be

16

$1,747,038.50. Of the entire loss calculation, Robinson's only objection was to paragraph 54, the intangible-harm factor. This paragraph did not even address Bayer's loss, but merely asserted that non-economic harm contributed to the difficulty of calculating actual loss. Robinson questioned neither the PSI's use of gain as an alternate measure of loss nor its calculation of his individual gain.

Again, at the sentencing hearing, Robinson raised no objection to the revised PSI's loss calculation (and in fact conceded that he had reached a "compromise" with the government regarding the loss amount). Robinson objected only to the denial of the continuance, which, as we have stated, was not an abuse of discretion by the district court. Because the district court properly relied on the revised PSI's undisputed factual statements in making the loss determination, there was no error.

For all of the foregoing reasons, we affirm.

**AFFIRMED.**