[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 11-11783; 11-11846

_____

D.C. Docket No. 0:10-cr-60077-FAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KERRY RAPHAEL,
GARY BAPTISTE,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 17, 2012)

Before WILSON, PRYOR and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

Gary Baptiste and Kerry Raphael appeal their convictions and sentences following a jury trial.  After thorough review of the record and briefs, and with the benefit of oral argument, we affirm the District Court.

## I. BACKGROUND[1]

This case arises out of a reverse sting operation conducted by Detective Sanchez of the Broward County Sheriff's Office in Florida.  Detective Sanchez posed undercover as a disgruntled operative of a Mexican drug cartel who wanted to orchestrate an armed robbery of his cartel's stash house.

Mr. Baptiste became involved in this operation when a confidential informant, Willie Perry, arranged a meeting between himself, Mr. Baptiste, Detective Sanchez, and another undercover agent on January 27, 2010.  During the meeting, Detective Sanchez explained to Mr. Baptiste that a large quantity of cocaine would be delivered to an as yet undisclosed stash house.  Mr. Baptiste agreed to coordinate and participate in an armed robbery to steal the cocaine.  He named two individuals who would help him: "Shakay" and "Gargoyle."  Shakay

---

[1]  We recite the facts in the light most favorable to the government.  United States v. Augustin, 661 F.3d 1105, 1111 (11th Cir. 2011).

was later identified as co-defendant Esequiel Perez, and Gargoyle was later identified as Mr. Kerry Raphael. At the end of the meeting, Mr. Baptiste indicated that he would talk to his associates about the particulars of the robbery.

On February 1, 2010, Detective Sanchez and Mr. Baptiste met a second time at another restaurant. This time, Mr. Baptiste came with co-defendant Mr. Perez. The three men discussed the details of the robbery. Mr. Perez and Mr. Baptiste discussed how they could process the stolen cocaine into crack. They also expressed concern that they might need more associates to successfully execute the robbery.

On February 18, 2010, Mr. Baptiste and Detective Sanchez met for a third time, this time at a pool hall. They discussed the possibility that Mr. Baptiste's team would encounter guards at the stash house. Mr. Baptiste, believing that Detective Sanchez did not want the robbery to be traced back to him, attempted to assuage Sanchez's concerns by saying: "the best way to do this . . . we go in but we have to take [the guards] out. There's no story."

On the evening of February 22, 2010, Detective Sanchez called Mr. Baptiste to inform him that the shipment of cocaine was going to be in town the following day. On February 23, Detective Sanchez met Mr. Baptiste and Mr. Perez at a gas station in preparation for the robbery. Mr. Baptiste and Mr. Perez then rode in a

3

Honda Accord and followed Detective Sanchez to a warehouse, which was the meeting place for the robbery.

While the three men were en route to the warehouse, police officers saw a gray Nissan Altima and a beige Ford Taurus leave a nearby CVS parking lot and head toward the warehouse. Mr. Raphael was in the back of the Altima with two other co-defendants. Mr. Baptiste entered the warehouse with Detective Sanchez. The Taurus was driven up to the warehouse. The Altima, with Mr. Raphael in the back seat, remained outside the warehouse area, while one of the co-defendants got out of the Altima wearing a ski mask and entered the warehouse.

At this point, SWAT team members executed their raid and arrested all the co-defendants, including Mr. Raphael and Mr. Baptiste. Mr. Raphael was arrested next to the Altima and searched. He was wearing all black, carrying a black ski mask, a loaded 9mm handgun magazine, and a holster. The magazine was compatible with a 9mm pistol found in the Taurus. In the Honda Accord driven by Mr. Baptiste and Mr. Perez, police found bullet proof vests, a loaded Ruger assault rifle, and black T-shirts.

After the arrest, police executed a search warrant on the defendants' cell phones and found a record showing phone calls between Mr. Baptiste's phone number and Mr. Raphael's phone number following each of Baptiste's meetings

4

with Detective Sanchez.  The phone records did not reflect the content of those conversations.

The search warrant also revealed text messages between Mr. Raphael and Mr. Baptiste.  On the day of the robbery, Mr. Raphael sent Mr. Baptiste a text message at 9:44 a.m. telling him to "get tie strap."  He sent another text one minute later saying, "troll use as handcuffs, it's white n plastic."  Mr. Raphael and Mr. Baptiste remained in periodic contact for the rest of the day leading up to the would-be robbery and raid.

## II. PROCEDURAL HISTORY

In March 2010, a grand jury indicted Mr. Baptiste, Mr. Raphael and five other co-defendants.  In November 2010, a grand jury returned a Superseding Indictment, charging the defendants as follows: Count One—Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); Count Two—conspiracy to possess with intent to distribute five kilograms of cocaine, in violation of 21 U.S.C. § 846; Count Three—attempt to possess with intent to distribute five kilograms of cocaine, in violation of § 846; Count Four—conspiracy to use and carry a firearm and ammunition during and in relation to a crime of violence, and during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(o); and Count Five—carrying a firearm and ammunition during a crime of

5

violence and in relation to a drug-trafficking crime, in violation of § 924(c)(1). Mr. Baptiste alone was charged with Count Six, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

The trial against the seven co-defendants lasted nine days. Mr. Baptiste mounted an entrapment defense alleging coercion on the part of confidential informant Willie Perry, and he testified at trial. Mr. Raphael did not put on an affirmative defense. At the close of the evidence, the jury deliberated for five days. On February 1, 2011, the jury returned a partial verdict. As to Mr. Raphael, the jury acquitted him of Counts Two and Three (conspiracy to possess cocaine charges), but did not reach a verdict on Counts One, Four, and Five (Hobbs Act and firearms possession charges). The jury convicted Mr. Baptiste on Count Six (possession of a firearm by a convicted felon), but reached no verdict on Counts One to Five. The District Court gave a modified <u>Allen</u> charge and sent the jury back for deliberations. The following day, the jury convicted Mr. Baptiste on Counts One, Four, and Five—the Hobbs Act conspiracy and firearms possession charges.[2] The jury convicted Mr. Raphael on Count One only—the Hobbs Act

---

[2] The jury remained undecided on all remaining counts against Mr. Baptiste. The government later dismissed those charges.

conspiracy.[3]

At sentencing, the District Court imposed a 660-month prison sentence on Mr. Baptiste, and a 120-month sentence on Mr. Raphael. The two appealed, raising a number of issues as to their convictions and sentences. We address Mr. Baptiste's arguments first, and then turn to Mr. Raphael's claims.

### III. DISCUSSION

#### A. Mr. Baptiste

Mr. Baptiste challenges his convictions and sentence on a number of grounds. We discuss Mr. Baptiste's strongest arguments, and describe the relevant facts as they apply to each issue.

##### 1. Limitation on Cross-Examination of Detective Sanchez

During cross-examination of Detective Sanchez, Mr. Baptiste questioned Sanchez about his interactions with confidential informant Mr. Perry. Detective Sanchez testified that he never discussed the issue of entrapment with Mr. Perry, and that he did not know whether any other detective had discussed entrapment with Perry. Detective Sanchez conceded that protocol required such a discussion. He further admitted that Mr. Perry received a benefit for cooperating as a

---

[3] As with Mr. Baptiste, the jury could not decide the remaining counts against Mr. Raphael. The government later dismissed those outstanding charges.

confidential informant—specifically, Perry received probation for a charge that would otherwise have carried a fifteen-year minimum sentence. Mr. Baptiste also asked Detective Sanchez whether he had checked Mr. Perry's "rap sheet," and whether he knew that Perry had been charged with attempted murder. Detective Sanchez indicated that he was aware of the attempted murder charge. Finally, Mr. Baptiste asked whether Detective Sanchez was aware that Mr. Perry had multiple arrests for dealing in cocaine, and attempted to introduce evidence concerning those prior arrests.

At this point, the District Court stopped the questioning of Detective Sanchez. The Court expressed concern that Mr. Baptiste was asking Detective Sanchez questions about a non-witness's criminal history, and that he could not "impeach or attack the credibility of a person who is not even in the courtroom and who may not even show up in the courtroom." Mr. Baptiste replied he was not impeaching Mr. Perry through his line of questioning. Rather, he intended to impeach Detective Sanchez for failure to do a thorough job of investigating Mr. Perry's background. He explained that Detective Sanchez's professional incompetence went to his credibility as a witness. Mr. Baptiste also explained that he wanted to ask Detective Sanchez additional questions about the probation that Mr. Perry received to show Sanchez's bias. The Court, however, did not allow

8

this line of questioning.

Mr. Baptiste argues that the District Court erred by preventing him from asking Detective Sanchez about Mr. Perry's criminal history and prior conduct. He asserts that none of the Federal Rules of Evidence flatly prohibits the introduction of evidence relating to a non-witness. He also argues that this error denied him his Due Process and Sixth Amendment rights to present a complete defense. See Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006).

We review Mr. Baptiste's claim that the District Court improperly limited the scope of his cross-examination for abuse of discretion. United States v. Maxwell, 579 F.3d 1282, 1295 (11th Cir. 2009). However, this discretion is limited by a criminal defendant's constitutional right to present a defense. See United States v. Frazier, 387 F.3d 1244, 1302 (11th Cir. 2004). While we typically review claims of constitutional error de novo, where a defendant fails to raise a constitutional claim in the district court, we review that claim on appeal for plain error. United States v. Douglas, 489 F.3d 1117, 1125 (11th Cir. 2007) (per curiam). We will reverse on plain error only when 1) there was an error; 2) the error was obvious; 3) the error affects the defendant's substantial rights; and 4) the error seriously affects the fairness, integrity or reputation of the judicial

9

proceeding.  Id.

After reviewing the trial transcripts, we conclude that the District Court erred in limiting the cross-examination of Detective Sanchez with regard to the evidence concerning Mr. Perry's criminal history.  In the same vein, we have held, for example, that the Federal Rules of Evidence permit a defendant to introduce evidence concerning the criminal history of a non-testifying confidential informant in order to substantiate the defense's theory that the informant had planted drugs on him at the time of his arrest.  See United States v. Stephens, 365 F.3d 967, 974–75 (11th Cir. 2004).  Thus, there is no blanket prohibition on admitting evidence concerning a non-testifying confidential informant's criminal history, if that evidence is used to substantiate a defense.  Cf. United States v. Williams, 954 F.2d 668, 672 (11th Cir. 1992) (restricting admission of evidence where it is used "to impeach a witness who does not testify." (emphasis added) ).  We conclude it was error in this circumstance for the District Court to prohibit Mr. Baptiste's line of questioning as to Mr. Perry's criminal history.

We have also concluded, however, that error was harmless.  See United States v. Cameron, 907 F.2d 1051, 1059–60 (11th Cir. 1990).  Mr. Baptiste argues that he should have been permitted to elicit additional facts regarding Mr. Perry to support his entrapment defense, including the fact that Perry was charged with

10

attempted murder, and that Detective Sanchez failed to follow protocol in screening Perry. Yet, the record demonstrates that Mr. Baptiste elicited testimony from Detective Sanchez about those very facts, including Mr. Perry's attempted murder charge, before the District Court cut off his questioning. Because that evidence was before the jury, we cannot say that the District Court's error prejudiced Mr. Baptiste.

As for Mr. Baptiste's claim that the District Court's limitation denied him an opportunity to present a complete defense under the Fifth Amendment, we have held that cross-examination of a witness may be required to elicit the substantive evidence necessary to present a complete defense. See United States v. Cohen, 888 F.2d 770, 776–77 (11th Cir. 1989). However, Mr. Baptiste never argued to the District Court that the limitations it placed on the cross-examination of Detective Sanchez deprived him of his constitutional right to present a defense. Therefore, the District Court never had an opportunity to consider Mr. Baptiste's constitutional claim, and so we review this claim for plain error only. See Douglas, 489 F.3d at 1125. For the same reasons that the District Court's evidentiary ruling constituted harmless error, it did not affect Mr. Baptiste's substantial rights, and thus does not rise to the level of plain error.

Mr. Baptiste also argues that the District Court's limitation of his

11

questioning of Detective Sanchez violated his rights under the Confrontation

Clause of the Sixth Amendment.  We ordinarily review a district court's decision

to limit the scope of cross-examination for abuse of discretion; however, this

discretion remains "subject to the requirements of the Sixth Amendment," United

States v. Diaz, 26 F.3d 1533, 1539 (11th Cir. 1994), which guarantees a criminal

defendant the right to impeach adverse witnesses.  United States v. Barrington,

648 F.3d 1178, 1188 (11th Cir. 2011).  But because Mr. Baptiste did not raise a

Sixth Amendment argument before the District Court, we also review this

argument only for plain error. Douglas, 489 F.3d at 1125.

The Sixth Amendment's Confrontation Clause is satisfied so long as cross-

examination exposes the jury to facts "sufficient to evaluate the credibility of the

witness."  Barrington, 648 F.3d at 1188 (quotation marks omitted).  Specifically,

courts are to inquire "whether a reasonable jury would have received a

significantly different impression of the witness' credibility had counsel pursued

the proposed line of cross-examination."  Id. (quotation marks omitted).

Mr. Baptiste argues that the District Court denied him the right to confront

Detective Sanchez by limiting his questions aimed at exposing the detective's bias.

However, we find no error, let alone plain error.  The District Court permitted

adequate cross-examination of Detective Sanchez, which revealed that he failed to

12

follow protocol and discuss entrapment with Mr. Perry, that he assisted Perry in getting a reduced sentence of probation, and that Perry was implicated in an attempted murder charge.  Thus, the jury had ample evidence to evaluate Detective Sanchez's credibility.  While Mr. Baptiste was denied the opportunity to delve into the specifics of Mr. Perry's criminal history, we cannot say that "a reasonable jury would have received a significantly different impression" of Detective Sanchez had they heard that evidence.[4]  See id. (holding that details of pending criminal charge would not have created a significantly different impression of witness where witness had already admitted to charge); Diaz, 26 F.3d at 1540.

2. Mr. Perry's Invocation of the Fifth Amendment

Mr. Baptiste's attempt to present his entrapment defense was complicated

---

[4]  Mr. Baptiste also argues that the District Court abused its discretion by disallowing another line of questioning.  On direct, Detective Sanchez testified that he selected ten kilograms of cocaine because "the story . . . had to be believable."  During cross-examination, Mr. Baptiste attempted to impeach Detective Sanchez's explanation by asking whether he had selected ten-kilograms in order to increase his sentence.  The District Court barred the line of questioning, ruling that sentencing was not an issue for the jury to consider.  Mr. Baptiste correctly argues that even if the sentence that he was facing was not generally admissible as evidence at trial, the line of questioning could have impeached Sanchez's proffered reason for selecting ten kilograms of cocaine.  See Ellis v. Capps, 500 F.2d 225, 227 (5th Cir. 1974) ("Facts wholly immaterial, or prejudicial to one of the parties on the main issue, may be material as affecting the credibility of a witness."); see also Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (holding as binding decisions rendered by the Former Fifth Circuit prior to the close of business on September 30, 1981).  Nonetheless, even if this ruling rose to the level of error, we conclude that the proffered evidence would not have created a significantly different impression of Detective Sanchez's credibility in light of the other impeachment evidence elicited during his cross-examination.

13

by the fact that, at the time of trial, Mr. Perry was in state custody on an attempted murder charge. During trial, Mr. Baptiste requested that the District Court issue a writ of habeas corpus ad testificandum. He explained to the Court that, in order to buttress his entrapment defense, he intended to prove that Mr. Perry had lied to the police about the number of times he called Mr. Baptiste. Counsel for Mr. Perry had previously informed Mr. Baptiste's counsel that Perry would assert his Fifth Amendment privilege to remain silent if asked about the number of times he contacted Baptiste.

The District Court ruled that Mr. Baptiste could not "drag in a witness without knowing what he's going to say when his lawyer has [said] that he's going to invoke the Fifth." The Court explained that Mr. Baptiste had to first demonstrate the relevance of Mr. Perry's testimony to his defense before it would issue a writ. However, the Court acknowledged that there might be a due process concern if he did not allow Mr. Baptiste to subpoena Mr. Perry; therefore, the Court agreed to sign and docket a writ of habeas corpus ad testificandum ordering Perry to testify.

To resolve the issue, the Court held a hearing outside the presence of the jury and by telephone with Mr. Perry's counsel, in which Mr. Baptiste read off the questions he wanted to ask Perry under oath. Mr. Perry's counsel responded that

14

he would advise his client to refuse to answer any of the questions by asserting his rights under the Fifth Amendment.  At the end of the hearing, the District Court ruled that the answers to the questions were protected by the Fifth Amendment. The Court stated that Mr. Perry was properly relying on his lawyer's advice, and that the Court would not force Perry "over here just to do something that is clear he would do here."  The Court then agreed to cancel the writ of habeas corpus ad testificandum at the request of the government.

Mr. Baptiste challenges the District Court's refusal to issue the writ based on Mr. Perry's assertion of his Fifth Amendment privilege.  We review for abuse of discretion a district court's decision to honor a potential witness's invocation of the Fifth Amendment right against self-incrimination.  United States v. Perez, 661 F.3d 568, 580 (11th Cir. 2011).  A witness must have "reasonable cause" to invoke the protection—a standard that does "not require a high showing."  Id.  With that said, "the privilege does not protect against 'remote and speculative possibilities'" of incrimination.  United States v. Gecas, 120 F.3d 1419, 1424 (11th Cir. 1997).

Mr. Baptiste argues that the District Court failed to make a proper inquiry into the legitimacy and scope of Mr. Perry's asserted Fifth Amendment privilege. See United States v. Goodwin, 625 F.2d 693, 701 (5th Cir. 1980).  Specifically, he contends that the Court made only a "perfunctory inquiry" by referring questions

15

to Mr. Perry's attorney instead of to Perry himself.  However, we have upheld a

district court's decision to honor invocations of the Fifth Amendment

privilege—even when the court did not direct its questions to the witness—where

the court otherwise had "sufficient, uncontested evidence before it on which to

find that [the witness] could plausibly fear that his answers . . . could lead to a

charge of perjury."  Perez, 661 F.3d at 580.  And at least one other circuit has held

that a district court does not abuse its discretion by refusing to force a witness to

take the stand outside the presence of the jury when the proposed line of

questioning is intended to substantiate the defense's theory that the witness was

the true perpetrator of the crime.  See United States v. Mares, 402 F.3d 511,

514–15 (5th Cir. 2005).

In reviewing the questions read to Mr. Perry's counsel during the hearing,[5]

---

[5] We list the questions below.  While the answers to the first two questions would likely not raise Fifth Amendment concerns under the facts of this case, the rest of the questions may have exposed Mr. Perry to prosecution for perjury.  See United States v. Fortin, 685 F.2d 1297, 1298 (11th Cir. 1982).

1.  Was Willie Perry the confidential informant in the case against Gary Baptiste?
2.  Mr. Perry, did you ever speak to Gary Baptiste on the phone regarding this case?
3.  If so, how many times? If so, how many of those calls are recorded?
4.  Did you ever meet with Gary Baptiste regarding this case? If so, how many times? Where?
5.  Do you know anything about the weapons that were provided in this matter?
6.  Did you provide any weapons to Mr. Baptiste or Mr. Perez or anyone else in this case?
7.  Did you provide the masks in this case?
8.  Did you provide the gloves in this case?

16

we conclude that the District Court did not abuse its discretion in refusing to force Perry to take the stand based on the Fifth Amendment.   Indeed, Mr. Baptiste's stated reason for calling Mr. Perry to the stand was to demonstrate that Perry lied to the police.  This being the case, the District Court did not err in concluding that Mr. Perry had reasonable cause to fear self-incrimination.  See Perez, 661 F.3d at 580; Mares, 402 F.3d at 514–15.

### 3. Missing Witness Instruction

After closing argument, Mr. Baptiste  requested that the District Court give a missing witness jury instruction regarding Mr. Perry.  The Court expressed concern that the government had not granted Mr. Perry immunity, which would have freed him to testify.  It nevertheless rejected the proposed instruction, because Mr. Perry was absent as a result of his claimed Fifth Amendment privilege as opposed to the government's reluctance to call him as a witness.

Mr. Baptiste argues that the District Court erred by refusing to give the jury a missing witness instruction as to confidential informant Perry.  A district court retains discretion to give a missing witness instruction.  United States v. Link, 921 F.2d 1523, 1529 (11th Cir. 1991).  Under the missing witness instruction rule, "[i]f

9.      Did you provide the bullet proof vests in this case?

17

it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case," then failure to call that witness permits an inference that the testimony would have been unfavorable to the party who refused to call the witness.  Id.; see also United States v. Nahoom, 791 F.2d 841, 846 (11th Cir. 1986).  However, a party who is unavailable by virtue of claiming the Fifth Amendment or another privilege does not support a missing witness instruction.  See United States v. Chapman, 435 F.2d 1245, 1247–48 (5th Cir. 1970); McClanahan v. United States, 230 F.2d 919, 926 (5th Cir. 1956) ("Ordinarily no inferences are permitted as a result of the failure to call to the witness stand one whose testimony would be privileged.").

This Court has not yet addressed the issue of whether the government's refusal to grant immunity to a witness may serve as a basis for a missing witness instruction.  But every circuit to have considered this question has held that the government's mere ability to grant immunity, without more, "does not make a witness who invokes the Fifth Amendment right not to testify peculiarly available to the government" within the meaning of the missing instruction witness rule. United States v. Rios, 636 F.3d 168, 171 (5th Cir. 2011) ; accord United States v. Myerson, 18 F.3d 153, 158–60 (2d Cir. 1994); United States v. St. Michael's Credit Union, 880 F.2d 579, 597–98 (1st Cir. 1989); United States v. Brutzman,

18

731 F.2d 1449, 1453–54 (9th Cir. 1984); United States v. Flomenhoft, 714 F.2d 708, 713–14 (7th Cir. 1983); United States v. Simmons, 663 F.2d 107, 108 (D.C. Cir. 1979).

Mr. Baptiste acknowledges that failure to grant immunity to a witness who claims the Fifth Amendment privilege ordinarily does not support a missing witness instruction, but suggests that this is not an ordinary case. Specifically, he notes that the District Court indicated that it would have "signed [an] immunity order in a minute" if the government had requested one, such that the government could have easily granted Mr. Perry immunity for any conduct relating to Mr. Baptiste's case. Further, he argues that the government had no legitimate interest in refusing to grant Mr. Perry immunity. The problem with Mr. Baptiste's argument is that it squarely contradicts the general rule that the government's mere ability to grant immunity to a witness who claims the Fifth Amendment privilege does not make that witness peculiarly available to the government. See Rios, 636 F.3d at 171. That the government could have easily granted immunity and had no legitimate reason for refusing to do so does not affect our application of this general rule. Therefore, the District Court did not err in refusing to give a missing witness instruction.

We are aware that some circuits have alluded to an exception to the general

19

rule for a substantial showing of abuse of prosecutorial discretion, and have also left open the possibility of an exception where circumstances suggest that the witness's testimony would have been exculpatory. See Rios, 636 F.3d at 172; Myerson, 18 F.3d at 159; St. Michael's Credit Union, 880 F.2d at 598 n.7, 599 n.8; Flomenhoft, 714 F.2d at 713–14. However, Mr. Baptiste did not argue in the District Court, and does not argue now, that either of these exceptions should apply here. Therefore, this is not a proper case to consider whether the government's refusal to grant its confidential informant immunity, where the defendant otherwise presented sufficient evidence to get an entrapment defense instruction, would have satisfied one of these exceptions.

4. Constructive Amendment of Superseding Indictment

Mr. Baptiste argues that the District Court's jury instructions as to Count One constructively amended his Superseding Indictment. Count One of the Superseding Indictment charged Mr. Baptiste with conspiring to "obstruct, delay, and affect interstate commerce and the movement of articles and commodities in commerce by means of robbery." In its jury instructions the Court permitted conviction if the jury found that Mr. Baptiste had conspired to "obtain or take the property of another, in this case cocaine," and "as a result of the defendant's actions, interstate commerce or an item moving in interstate commerce would have

20

been delayed, obstructed or affected in any way or degree."

We review de novo whether jury instructions constructively amend the charges alleged in an indictment. See United States v. Sanders, 668 F.3d 1298, 1309 n.9 (11th Cir. 2012). A constructive amendment is per se reversible error. United States v. Narog, 372 F.3d 1243, 1247 (11th Cir. 2004); United States v. Carroll, 582 F.2d 942, 944–45 (5th Cir. 1978).

We have held that a constructive amendment occurs when "the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." United States v. Peel, 837 F.2d 975, 979 (11th Cir. 1988) (quotation marks and alteration omitted); see also United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990) ("[A constructive] amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.").

Mr. Baptiste relies heavily on the Supreme Court case, Stirone v. United States, 361 U.S. 212, 80 S. Ct. 270 (1960), in which the defendant had been indicted for violating the Hobbs Act by causing "supplies and materials (sand) to move in interstate commerce" through extortion. Id. at 213–14, 80 S. Ct. at 271. The district court in Stirone instructed the jury that it could find the defendant

21

guilty based either on his dealing in sand or in steel—an article of commerce not originally charged in the indictment. Id. at 214, 80 S. Ct. at 271. The Supreme Court held that the jury instruction violated the Fifth Amendment because it permitted conviction on a ground not charged in the indictment. Id. at 219, 80 S. Ct. at 274. Mr. Baptiste argues that the Superseding Indictment here charged defendants with conspiracy to obstruct or delay articles in commerce by means of robbery. The District Court's instructions, however, permitted conviction based upon a finding that the defendants conspired to commit a robbery that could incidentally affect commerce, whether or not the conspiracy involved an article in commerce. Thus, according to Mr. Baptiste, the instructions amended the indictment from one alleging a conspiracy to affect a commodity in commerce to one alleging a conspiracy to rob any article with an incidental affect on commerce.

We reject Baptiste's argument because it reflects a misreading of the Superseding Indictment.[6] Count One charged defendants with a conspiracy to "obstruct, delay, and affect interstate commerce and the movement of articles and commodities in commerce by means of robbery." Although Count One defined

---

[6] The government correctly notes that Baptiste failed to preserve the constructive amendment issue by failing to raise an objection on such grounds at the time the District Court issued its proposed jury instructions. The government, therefore, urges us to review the lower court for plain error only. However, as explained above, the constructive amendment of an indictment is per se reversible error. Carroll, 582 F.2d at 944–45.

22

the conduct affecting commerce in the conjunctive—conspiracy to affect interstate commerce and the movement of articles in commerce—our precedent is clear that proof of only one act that is charged in the conjunctive with another act in the same count is sufficient to support a conviction. United States v. Felts, 579 F.3d 1341, 1344 (11th Cir. 2009). In other words, "and" in Count One of the Superseding Indictment really means "or." Thus, the Superseding Indictment charged Mr. Baptiste with conspiring to affect interstate commerce or the movement of an article in commerce by means of robbery. See id. The District Court's instruction, therefore, did not allow Mr. Baptiste to be convicted of an offense not charged in the indictment.

This being the case, Stirone is readily distinguishable. In Stirone, the Court explained that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another." Id. at 218, 80 S. Ct. at 274. Here, the Superseding Indictment identified two bases for the alleged Hobbs Act conspiracy, such that the District Court jury instructions fell within the range of conduct alleged in Count One.

### 5. Reasonableness of Sentence

In the Pre-Sentence Report (PSR), the probation officer determined that Mr. Baptiste's base offense level was 32, but that he was subject to a 4-level

23

enhancement for his role as an organizer in the conspiracy, resulting in a total offense level of 36. With a criminal history category of II, Mr. Baptiste's recommended guideline range was 210 to 262 months imprisonment. The government objected to the PSR and requested a 2-level enhancement for perjured testimony, which would correspond to a guideline range of 262 to 327 months. At sentencing, the government proposed a sentence of 300 months.

The District Court adopted the PSR and also sustained the government's objection, finding that the proper guideline range was 262 to 327 months. The Court then turned toward the sentencing factors under 18 U.S.C. § 3553(a). It stated that "the nature and circumstances of the offense . . . [make it] about as serious, short of murder, as it can get." The Court further stated that, even though Baptiste didn't have the criminal record of persons who usually participate in this type of offense, it had to consider adequate deterrence to future criminal conduct. Then, the Court opined, "I think a sentence of imprisonment will give [Mr. Baptiste] the needed educational/vocational training and the medical care and other correctional treatment that is most effective." The Court also noted that the sentence had to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. "[O]ne of the most important factors" according to the Court was to "protect the public from further crimes of the

24

defendant." The Court found that this final factor required a substantial sentence. Although no one was killed, the Court had "no question that [Mr. Baptiste] intended, based upon his words and actions, [and] based upon using the other defendants[,] to commit the home invasion robbery and kill the guards." With these factors in mind, the Court imposed the statutory maximum on three of the four counts for which Mr. Baptiste was convicted.[7] The sentence for each count was imposed to run consecutive to the others for a total of 660 months. The Court stated that even though Baptiste would be an old man by the time he got out of prison, that was "the only thing that [could] protect society." The Court continued: "[s]ome individuals are beyond rehabilitation and I think Gary Baptiste is one of them."

We review sentencing decisions for reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). The sentencing court must begin by correctly calculating the guideline range and then consider the appropriate § 3553(a) factors. Id. at 49, 128 S. Ct. at 596. A district court abuses its discretion when it "gives significant weight to an

---

[7] The District Court imposed the following sentences on each count: the 240 month statutory maximum for Count One; the 240 month statutory maximum for Count Four; the sixty month mandatory minimum for Count Five; and the 120 month statutory maximum for Count Six.

improper or irrelevant factor." United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quotation marks omitted). The Supreme Court has recently held that, under 18 U.S.C. § 3582(a), a sentencing court "may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." Tapia v. United States, — U.S. —, —, 131 S. Ct. 2382, 2393 (2011).

Mr. Baptiste argues that the District Court violated Tapia, that it lacked evidence to support that he is beyond rehabilitation, and that imposing consecutive sentences was inappropriate. We address each argument in turn.

Tapia tells us that a district court may not, under 18 U.S.C. § 3582(a), consider rehabilitation in deciding whether to impose imprisonment, or in deciding the length of imprisonment. However, the District Court here relied primarily on the seriousness of the crime in crafting the length of the sentence. It only mentioned medical and correctional treatment once in passing, suggesting that this factor ultimately played little if any role in the Court's analysis. This distinguishes Mr. Baptiste's case from Tapia, where the sentencing court twice mentioned the need for drug rehabilitation, and described the need for treatment as the "number one" factor in sentencing. Tapia, 131 S. Ct. at 2385, 2392–93. Therefore, we hold that the District Court did not violate Tapia in sentencing Mr. Baptiste.

26

We also reject Mr. Baptiste's argument that inadequate evidence supported the District Court's finding that he was beyond rehabilitation. At its core, the District Court's finding on rehabilitation was based on the risk that Mr. Baptiste posed to public safety because the offense was "about as serious, short of murder, as it can get." Mr. Baptiste challenges this determination by arguing that the Court's finding as to the severity of his crime was unreasonable. We cannot agree. The record contains Mr. Baptiste's statements indicating that he was willing to kill the stash house guards if necessary, and evidence showed that he was arrested with a number of firearms, including an assault rifle, and over 100 rounds of ammunition.

Finally, Mr. Baptiste urges this Court to hold that imposition of consecutive sentences for Counts Four, Five and Six was improper. He draws our attention to 28 U.S.C. § 994(l)(2), which instructs the Sentencing Commission to ensure that the Sentencing Guidelines reflect "the general inappropriateness of imposing consecutive terms of imprisonment for an offense of conspiring to commit an offense . . . and for an offense that was the sole object of the conspiracy or solicitation." Mr. Baptiste notes that he received a maximum twenty-year sentence for the § 924(o) conspiracy to possess a firearm in furtherance of a drug trafficking crime, in addition to the five-year sentence for the § 924(c) conviction

27

for carrying and using a firearm during a drug trafficking crime, and the maximum ten-year sentence for the § 924(g)(1) conviction for possession of a firearm by a convicted felon. He argues that § 994(l)(2) renders consecutive sentencing on these counts inappropriate.

Mr. Baptiste's argument does not carry the day. First, § 994(l)(2) does not, in and of itself, prohibit the imposition of consecutive sentences for a substantive offense and a conspiracy to commit that offense. United States v. Wade, 788 F.2d 722, 722 (11th Cir. 1986); see also United States v. Saccoccia, 58 F.3d 754, 787 (1st Cir. 1995). Second, § 924(c) expressly provides that any sentence imposed under that sub-section shall not run concurrently to another sentence, meaning that it must be consecutive. 18 U.S.C. § 924(c)(1)(D)(ii); see also United States v. Dowd, 451 F.3d 1244, 1252 (11th Cir. 2006). Thus, we cannot say that the District Court's decision to impose consecutive sentences on the § 924(c) and § 924(o) convictions was inappropriate under § 994(l)(2). That leaves only his sentence under § 924(g)(1), possession of a firearm by an armed felon. But that is not the substantive offense contemplated by his § 924(o) offense, which was conspiracy to possess a firearm in furtherance of a drug trafficking crime. Therefore, we also cannot say that imposition of the consecutive sentences for his § 924(g)(1) and § 924(o) convictions was inappropriate under § 994(l)(2).

28

### 6. Conclusion

For these reasons, we affirm Mr. Baptiste's convictions and sentence. We note that Baptiste raises other issues on appeal,[8] but in our view these additional claims do not merit discussion.

### B. Mr. Raphael

Mr. Raphael challenges his conviction and sentence on a number of grounds. As with Mr. Baptiste, we discuss his strongest arguments, and describe the relevant facts as they apply to each issue.

### 1. Sufficiency of the Evidence

Mr. Raphael moved for judgment of acquittal at the close of the government's case in chief, arguing that the government failed to prove he knew the object of the conspiracy was cocaine. The District Court denied the motion, but it acknowledged that the question was "close." The Court later instructed the jury that the government had to prove that the defendants knew the object of the conspiracy was to rob cocaine. The jury ultimately returned a verdict convicting Mr. Raphael of Count One, which charged him with conspiracy to commit robbery

---

[8] Baptiste argues that the District Court's <u>Allen</u> charge was unduly coercive; that the Hobbs Act is unconstitutional; and that the District Court's reliance on uncharged and unproven conduct at sentencing violated his Fifth and Sixth Amendment rights. Each of these claims is foreclosed by circuit precedent. <u>See</u> <u>United States v. Taylor</u>, 480 F.3d 1025, 1027 (11th Cir. 2007); <u>United States v. Faust</u>, 456 F.3d 1342, 1347–48 (11th Cir. 2006); <u>United States v. Dickerson</u>, 248 F.3d 1036, 1050 (11th Cir. 2001).

29

under the Hobbs Act.

This Court reviews de novo the sufficiency of the evidence supporting a conviction, drawing all reasonable inferences in the light most favorable to the jury's verdict.  United States v. Gowdy, 628 F.3d 1265, 1267 (11th Cir. 2010); see also United States v. Friske, 640 F.3d 1288, 1290 (11th Cir. 2011).

The Hobbs Act makes it a crime to "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery . . . or conspire[] so to do."  18 U.S.C. § 1951(a).  In order to sustain a conviction for a Hobbs Act conspiracy, the government must prove that 1) "two or more persons agreed to commit a crime" under the Hobbs Act; 2) "the defendant knew of the conspiratorial goal"; and 3) "he voluntarily participated in helping to accomplish that goal."  United States v. Thomas, 8 F.3d 1552, 1556 (11th Cir. 1993) (quotation marks omitted); see also United States v. Pringle, 350 F.3d 1172, 1176 (11th Cir. 2003).

Mr. Raphael argues that the evidence presented at trial did not establish that he knew the conspiratorial objective was to rob cocaine.  He asserts that while the evidence might be sufficient to prove that he was part of a conspiracy to commit robbery, this is not sufficient to sustain a Hobbs Act conviction.  He points us to two cases he believes are particularly instructive.  First, in United States v.

30

Martinez, 83 F.3d 371 (11th Cir. 1996), we addressed the sufficiency of the

evidence for a conspiracy to possess cocaine, and to possess cocaine with intent to

distribute, in violation of 21 U.S.C. §§ 846 and 841. Id. at 373. The defendants

were arrested after breaking and entering a house and taking suitcases loaded with

fake and real cocaine. Id. We reversed the convictions for one of the defendants,

holding that there was not enough evidence to support a jury finding that he knew

he was going to the house to steal cocaine. Id. at 374. Specifically, we noted the

government failed to show that the "[lead conspirator]—or anyone else—ever told

[the defendant] that the true object of the burglary was cocaine." Id. We rejected

the government's argument that knowledge could be inferred from a co-

conspirator's statement that he had "men and guns ready." Id.

In United States v. Charles, 313 F.3d 1278 (11th Cir. 2002), we also

considered a conspiracy conviction under §§ 846 and 841. In Charles, the

defendants arranged to burglarize and steal cocaine from a stash house. Id. at

1283–84. On the evening of the heist, one defendant met with the conspirators in a

hotel room. He then rode with two conspirators to the target home, and remained

in the car while the two conspirators entered the house. At this point, they were all

arrested. Id. at 1282. We held that the evidence against the defendant, while it

might have been sufficient to support a robbery conviction, was insufficient to

31

sustain his convictions under §§ 846 and 841.  Id. at 1283–84.  Citing Martinez, we rejected the argument that the defendant's presence in the hotel room with the other conspirators, and his transportation of the two conspirators to the target house, sufficed to permit the inference that he knew the object of the conspiracy was to possess cocaine.  Id. at 1284–85.

Mr. Raphael relies on Martinez and Charles to argue that, while the evidence might be sufficient to prove that he was part of a conspiracy to commit robbery, it did not establish his knowledge of cocaine as the object of the conspiracy.  In response, the government argues that the evidence is sufficient to permit the jury to infer Raphael's knowledge of the conspiratorial goal.  The government also argued, for the first time at oral argument, that the holdings of Martinez and Charles are limited to §§ 846 and 841 conspiracy convictions, and therefore are inapplicable to Hobbs Act conspiracy convictions.

Turning first to the government's eleventh-hour argument that the holdings of Martinez and Charles, as drug possession conspiracy cases, do not apply to Hobbs Act conspiracy cases, "we do not consider arguments not raised in a party's initial brief and made for the first time at oral argument."  Holland v. Gee, 677

32

F.3d 1047, 1066 (11th Cir. 2012) (quotation marks omitted).[9]  Therefore, we turn

to the question of whether there was sufficient evidence to support the jury's

finding that Mr. Raphael knew the object of the conspiracy was cocaine.  Not

surprisingly, the government answers that question in the affirmative.  It argues

that what really distinguishes Mr. Raphael's case from Charles and Martinez is the

"existence of documented contacts between [Mr. Raphael's] telephone number and

organizer-Baptiste's number at every juncture leading up to their appearances at

the warehouse."  In fact, the phone records demonstrate that Mr. Baptiste, the

organizer, called Mr. Raphael within a couple hours after his meetings with

Detective Sanchez on January 27, February 1, and February 18—meetings at

which Baptiste discussed cocaine in detail as the objective of the armed robbery.

Mr. Raphael was also in communication with Mr. Baptiste and other conspirators

the night before the planned robbery.  On the day of the robbery, Mr. Raphael sent

Mr. Baptiste a number of text messages, including instructions to "get tie strap" to

---

[9] The government also submitted supplemental authority suggesting that the District Court erroneously added the knowledge of cocaine element to the Hobbs Act conspiracy count. See, e.g., United States v. Guevara, 408 F.3d 252, 258 (5th Cir. 2002) ("[T]he jury instruction may not become law of the case if both (1) it is patently erroneous and (2) the issue is not misstated in the indictment.").  However, we are not persuaded by this argument.  The government unequivocally stipulated at a pretrial conference that the defendants could only be convicted of the Hobbs Act conspiracy charge if they had knowledge the object of the conspiracy was cocaine. Therefore, we cannot say that the District Court erred in its jury instructions when it required that the government prove the defendants knew the object of the conspiracy was to rob cocaine. Cf. id.

"use as handcuffs." The two remained in periodic contact for the rest of the day leading up to the would-be robbery and raid.

We agree that these facts, construed in the light most favorable to the government, distinguish Mr. Raphael's case from Charles and Martinez, insofar as they present sufficient evidence for a reasonable jury to find Mr. Raphael was an active participant in planning the robbery. Cf. Charles, 313 F.3d at 1286 (noting defendant's passive role). From the text messages in which Mr. Raphael directed Mr. Baptiste to purchase tools for the robbery, a jury could reasonably infer that Mr. Raphael played a substantial role in planning the scheme. And based on Mr. Raphael's role in assisting Mr. Baptiste to plan the heist, a jury could reasonably infer that the two men discussed the objective of the robbery—cocaine—after at least one of the meetings Mr. Baptiste had with Detective Sanchez. We believe that this evidence is sufficient to take an inference that Raphael had knowledge of the conspiratorial objective beyond the realm of mere speculation.

### 2. Reasonableness of the Sentence

The PSR assigned Mr. Raphael a base offense level of 20 under U.S.S.G. § 2B3.1(a). It recommended a 5-level enhancement for possession of a firearm under § 2B3.1(b)(2)(C), and a 1-level enhancement for cocaine as the object of the robbery under § 2B3.1(b)(6), for a total offense level of 26. With a criminal

34

history category of I, the recommended guideline range was 63 to 78 months.

Mr. Raphael filed objections to the PSR. The government filed a motion seeking an upward departure, arguing that the criminal history category of I understated Mr. Raphael's past criminal activity, which included acquitted charges of purchasing untraceable guns and possessing illegal firearms. The government recommended a sentence of 15 years. At sentencing, the District Court found that adequate evidence supported the enhancement for possession of a firearm under § 2B3.1(b)(6), citing the 9mm magazine clip and holster on Raphael's person, and a matching 9mm handgun found in the Ford Taurus. The District Court adopted the PSR in all respects, finding that the guideline range was 63 to 78 months.

In considering the § 3553(a) factors, the District Court highlighted the seriousness of the offense, the need for punishment, the need to protect the public, and the seriousness of Raphael's prior acquitted firearms offenses. The Court denied the government's request for an upward departure, but then imposed an upward variance, increasing the sentence over the maximum of the guideline range to 120 months, "because the criminal history [was] not properly reflected" in the guideline range, and because the upward variance would "protect the public from further crimes of the defendant."

Mr. Raphael argues that the District Court, by allowing the 5-level

enhancement for firearm possession, subjected him to punishment for a charge of which he was acquitted.  As for the cocaine enhancement, Raphael contends the District Court subjected him to punishment for a crime for which he was never charged.  Finally, Mr. Raphael contends that the District Court failed to consider any § 3553(a) factors in imposing the upward variance other than his criminal history.  Each of these arguments fails.

Circuit precedent allows district courts to calculate prison sentences based on acquitted conduct, provided that the sentence does not exceed the statutory maximum,[10] and the sentence is supported by a preponderance of the evidence. United States v. Campbell, 491 F.3d 1306, 1314 n.11 (11th Cir. 2007).  Thus, Raphael's argument that the District Court improperly considered his acquitted firearms charges fails.  As to Raphael's claim that he was convicted of uncharged conduct for his cocaine enhancement, circuit precedent also permits the consideration of uncharged conduct in determining sentencing levels.  See, e.g., United States v. Miller, 166 F.3d 1153, 1155 (11th Cir. 1999).  Beyond that, this argument depends on the erroneous conclusion that Count One of the Superseding Indictment did not cover cocaine as an element of the charged offense.  Finally,

---

[10] Mr. Raphael's sentence did not exceed the Hobbs Act statutory maximum of twenty years. See 18 U.S.C. § 1951(a).

the record does not support Raphael's claim that the District Court only considered his criminal history in applying the § 3553(a) factors.

### 3. Conclusion

Although Raphael raises other issues on appeal,[11] these claims do not merit discussion. We therefore affirm Raphael's conviction and sentence.

### IV. CONCLUSION

The convictions and sentences of Gary Baptiste and Kerry Raphael are AFFIRMED.

---

[11] Raphael argues that the District Court erroneously admitted statements by his co-conspirators under Federal Rule of Evidence 801(d)(2)(E); that the Court erred in denying his motion to suppress data retrieved from his cell phone; that it erred in denying his motion to dismiss the Superseding Indictment for lack of specificity; that it erred in denying his motion to strike the alias "Gargoyle"; and that it erred in denying his motion for mistrial based on the government's comments at closing argument.